585 A.2d 454

COMMONWEALTH of Pennsylvania, Appellee,

v.

Roger Seamon PROCTOR, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 25, 1990.

Decided Jan. 16, 1991.

Reargument Denied March 13, 1991.

Anthony J. Vardaro, Terry Toomey (Court-appointed), Meadville, for appellant.

John M. Dawson, Dist. Atty., Meadville, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On March 20, 1986, Appellant, Roger Seamon Proctor was convicted of murder of the first degree, robbery, conspiracy to commit murder, and conspiracy to commit robbery. On that same day a sentencing hearing was held pursuant to the Sentencing Code 42 Pa.C.S.A. § 9711(a) and the jury unanimously sentenced Appellant to death.[1] Appellant filed post trial motions which were denied by the trial court.

1. On the remaining charges Appellant was sentenced by the trial court to consecutive terms of imprisonment of six to twelve years for

Briefs in support of Appellant's direct appeal to this Court were filed by trial counsel. Prior to argument in this Court, Appellant filed a *pro se* application for extraordinary relief alleging the ineffectiveness of trial counsel. At the time of argument, we entered an order remanding the case to the trial court for the appointment of new counsel and for an evidentiary hearing to determine the effectiveness of trial counsel. The trial court conducted hearings in accordance with that order and determined that trial counsel was ineffective in failing to file a pre-trial motion to suppress Appellant's oral statement to the police and in using a particular trial strategy (admitting guilt and then arguing that the homicide rose no higher than second degree murder, or, in the alternative, that the death penalty was unwarranted). The trial court returned the record to this Court without taking further action.

Supplemental briefs regarding Appellant's claims of ineffectiveness were filed with this Court and the case was again listed for argument. Following argument, we remanded the case to the trial court a second time "for a suppression hearing to determine the legality of Appellant's arrest in Ohio and the admissibility of statements and other evidence obtained as a result of that detention", 521 Pa. 479, 555 A.2d 1293. A suppression hearing was held and the trial court concluded that Appellant's arrest and detention in Ohio was lawful; that the defendant was adequately advised of his Miranda rights and his statement was voluntary; and that neither the statement nor the evidence obtained as a result of the statement was subject to suppression.

The case was listed a third time for argument in this Court. Supplemental briefs regarding the legality of Appellant's arrest in Ohio were filed and argued. We now undertake our review of Appellant's direct appeal to this Court.

robbery, four to eight years for conspiracy to commit murder, and four to eight years for conspiracy to commit robbery.

Appellant does not raise the issue of whether there was sufficient evidence to sustain his conviction for murder of the first degree. We are required, however, to review all death penalty cases for the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982) cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), reh'g denied, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Viewing the evidence in the light most favorable to the Commonwealth the record reveals the following facts: During October of 1985, Appellant and his accomplice Diedre Owens traveled from Cincinnati, Ohio, to Meadville, Pennsylvania. (Appellant had become acquainted with Owens five months earlier.) On their first day in Meadville, Wednesday, October 16, 1985, Appellant and Owens discussed their lack of money and the fact that Owens knew the victim, Gerald Gase, an eighty-four year old man, who they could rob and may have to kill to prevent him from identifying Owens. Appellant and Owens visited the victim during the afternoon on that day but left without incident.

During the afternoon of Friday, October 18, 1985, Appellant and Owens went to the victim's home again. The victim was in his front yard raking leaves. The couple's plan was for Appellant to distract the victim while Owens snuck into his home to steal money. This plan was foiled when the victim went into his home for unknown reasons and locked the door behind him upon returning to the yard. Appellant and Owens left the victim's home and went to a local bar. The relentless pair then returned to the victim's home a third time at approximately 6:00 p.m. that same evening. Appellant, Owens and the victim talked in the kitchen for about thirty minutes and then moved into the living room to watch television. The victim received a phone call and went into the kitchen providing the couple with an opportunity to discuss the fact that they needed "to find some type of weapon to knock him [the victim] out with". Trial Transcript (T.T.) March 19, 1986 at p. 298. Some time after the victim returned to the living room,

Appellant went into the kitchen and feigned that he was getting a drink of water. In the kitchen he seized a pair of scissors from the kitchen table and tucked them into the waistband of his pants. When the victim left the room again to answer another phone call, Appellant positioned himself in front of a mantelpiece near the fireplace so that he would be hidden from the view of the victim when the victim returned to the living room.

At this point Owens told Appellant, "Roger, I'll tell you when to do it. I'll tell you when he comes in". T.T., March 19, 1986, at p. 305. When the victim entered the room Owens shouted, "Now" and the Appellant stabbed the victim with the scissors. The victim fell to the floor and was still living when Appellant removed his wallet and handed it to Owens. Owens removed approximately $100 from the wallet and then went through various drawers and closets wherein she found approximately $40 more. The couple left the victim's home and Appellant threw the murder weapon into a bush at a neighboring house.

The body of the victim was discovered on Sunday, October 20, 1990, by friends who became concerned when he did not answer his phone. The victim was discovered lying on the floor of his living room in a fetal position with a pool of blood under his head. He had been stabbed fifty-seven times.

After beginning an investigation, the Meadville Police discovered that Owens and a traveling companion named Roger (the Appellant) were seen in the vicinity of the victim's home around the time of the murder. Appellant and Owens became suspects. After tracing the couple's whereabouts from Franklin, to Oil City and finally Pittsburgh, Pennsylvania, Meadville police learned that Owens may attempt to return to Forest Park, Ohio to pick up a welfare check at a residence where both she and Appellant were receiving mail. Meadville Police alerted the Forest Park Police Department to its investigation and to the fact that Appellant and Owens may be returning to Forest Park.

The Forest Park Police received information from the Ohio State Parole Office that there was an outstanding warrant for Owens arrest due to a parole violation. Forest Park Police also checked Ohio's "Regional Crime Information System" for outstanding warrants on Appellant and learned that there was a *capias* warrant (Pennsylvania's equivalent to a bench warrant) for his arrest. The *capias* warrant was due to Appellant's failure to appear after sentencing to pay a fine on a misdemeanor traffic violation (leaving the scene of an accident). Appellant would have been unable to post bond to secure his release because of a "no bond" stipulation placed on the *capias* warrant by the issuing judge.

On Saturday, November 2, 1985, Appellant and Owens were arrested in Forest Park, Ohio at 9:45 a.m. Appellant was taken into custody pursuant to the outstanding *capias* warrant and was also charged with driving without a license. Meadville Police were immediately notified of the arrests. A Meadville police officer arrived in Forest Park, Ohio at 8:00 p.m. Saturday, November 2, 1985, to interview Appellant and Owens. The police officer read Appellant his Miranda rights and Appellant gave an inculpatory statement concerning the murder. Upon agreement, Appellant was moved to a room that was acoustically suited for tape recording and repeated his statement which was recorded on tape. During the course of the statement Appellant admitted killing the victim, identified the murder weapon as a pair of scissors and stated that he disposed of the murder weapon in a bush at a neighboring home. A warrant for Appellant's arrest for the killing of Gerald Gase in Pennsylvania was issued shortly after midnight on Sunday, November 3, 1985. Appellant voluntarily waived extradition and was returned to Crawford County, Pennsylvania. Appellant testified at his own trial and admitted to killing the victim, he testified however, that he only stabbed the victim three or four times.

Based upon the foregoing, we find that there was sufficient evidence to support the jury's verdict that Appellant

was guilty of murder of the first degree beyond a reasonable doubt.

Appellant raises several issues for our review. Initially, Appellant questions the legality of his arrest and detention in Ohio asserting that it was merely a ruse to hold him until the arrival of Pennsylvania authorities. Appellant asserts that the police in Ohio failed to take him before the judge who issued the *capias* warrant immediately after his arrest, that he was illegally detained and, as a result, any statement obtained from him should have been suppressed.

In *Commonwealth v. Harris*, 491 Pa. 402, 421 A.2d 199 (1980), this Court held that where a criminal defendant is arrested by police in another state, the law of the state where the arrest took place is applied in determining the legality of that arrest. Therefore, we must look to the law of Ohio to determine the legality of Appellant's arrest.

In this case Appellant was arrested pursuant to an outstanding non-bondable *capias* warrant issued by an Ohio judge before whom appellant failed to appear to pay a fine. The fine was imposed due to Appellant's conviction for failure to stop at the scene of an accident. Ohio's criminal statutes provide that a warrant may be issued for the arrest of an offender who fails to pay a fine imposed as part of a sentence in a criminal case and that "[a]ny offender held in custody pursuant to such an arrest shall be entitled to a hearing on the first regularly scheduled court day following the date of arrest ...". Ohio Rev.Code Ann. § 2947.14 (Baldwin, 1987).

At the suppression hearing in this case it was established that Appellant was arrested by Forest Park police officers at 9:00 a.m. on Saturday, November 2, 1990. At the time of Appellant's arrest the Hamilton County court system, which encompasses the city of Forest Park, Ohio, operated on a six day basis, excluding Sundays. It was the policy of that Court that anyone arrested after 5:00 a.m. on any particular day could not be placed on that day's docket and was held until the following court day for arraignment. Since Appel-

lant was arrested on Saturday at 9:00 a.m. he could not have been taken before the judge who issued the *capias* warrant until Monday morning. The suppression court was correct in determining that Appellant's detainment was legal under Ohio law.

■ Appellant also argues that the conduct of the Ohio police officers was in derogation of Ohio statutes which require that police provide an arrestee with facilities to communicate with an attorney. Appellant claims that since that police did not affirmatively advise him of his right to communicate with an attorney, his detention was illegal, and, as a result, any statement obtained from him should have been suppressed. The statutes, to which Appellant refers, provide as follows:

> After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his choice for the purpose of obtaining counsel.

Ohio Rev.Code.Ann. § 2935.20 (Baldwin, 1987).

> If the person arrested is unable to offer sufficient bail or, if the offense charged be a felony, he shall, prior to being confined or removed from the county of arrest, as the case may be, be speedily permitted facilities to communicate with an attorney at law of his own choice, or to communicate with at least one relative or other person for the purpose of obtaining counsel (or in cases of misdemeanors or ordinance violation for the purpose of arranging bail). He shall not thereafter be confined or removed from the county or from the situs of initial detention until such attorney has had reasonable opportunity to confer with him privately, or other person to arrange bail, under such security measures as may be necessary under the circumstances.
>
> Whoever, being a police officer in charge of a prisoner, or the custodian of any jail or place of confinement, violates

this section shall be fined not less than one hundred nor more than five hundred dollars or imprisoned not more than thirty days, or both.

Ohio Rev.Code Ann. § 2935.14 (Baldwin, 1987).

Initially, we note that the above statutes are permissive and do not place an affirmative duty on police officers to advise a defendant of his right to communicate with an attorney. In each of the cases cited by Appellant the defendant asked to speak to an attorney and was refused permission to do so. *State v. Jones,* 37 Ohio State 2d 21, 306 N.E.2d 409 (1974); *Dayton v. Nugent,* 25 Ohio Misc. 31, 265 N.E.2d 826 (Municipal Court, 1970); *Siegwald v. Curry,* 39 Ohio Misc. 16, 314 N.E.2d 191 (Municipal Court, 1973). In *Jones,* the Ohio Supreme Court noted that R.C. §§ 2935.-14 and 2935.20 "require generally, that a person arrested or confined be provided facilities with which to obtain counsel or communicate with his attorney". *Id.* at 24, fn. 1; 306 N.E.2d at 411 fn. 1. In *Jones,* that Court, although deciding the case on broader constitutional grounds, stated that police conduct of not permitting the defendant to use the telephone until two days after his arrest should not be countenanced. In this case the suppression court determined on competent evidence of record that Appellant had not requested to speak to an attorney.

More importantly, however, in *Columbus v. Reid,* 32 Ohio App.3d 7, 513 N.E.2d 351 (1986) (appeal denied, Supreme Court of Ohio, May 6, 1987), the Ohio Court of Appeals refused to apply an exclusionary rule to a violation of R.C. § 2935.20. The court in *Reid* stated:

The Supreme Court of Ohio has not, to this date, imposed an exclusionary rule for violations of provision of the Ohio Constitution, let alone violations of state statutes. Until the Supreme Court of Ohio sanctions, such a step, this appellate court is unwilling to impose a sanction of suppression ...

*Id.* at 8, 513 N.E.2d at 352. Thus, Appellant's argument fails.

256

■ Appellant argues next that although he received Miranda warnings before his initial oral statement to the Meadville police, because those warnings were not repeated, his subsequent tape recorded statement should have been suppressed.

In *Commonwealth v. Ferguson,* 444 Pa. 478, 282 A.2d 378 (1971) we held that not every renewal of the interrogation process requires the repetition of Miranda warnings and that the court must look to the circumstances of each case to determine whether the warning has become stale. The criteria used in making this determination are:

the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Commonwealth v. Bennett,* 445 Pa. 8, 282 A.2d 276 (1971).

In this case the time lapse of ten minutes between the initial statement and the tape recorded statement was minimal, the same officer who gave the Miranda warnings conducted the interrogations, and similar statements were elicited. The fact that the Appellant was moved from one room to a neighboring room which was acoustically suited for tape recording was inconsequential and did not require the repetition of Miranda warnings. *See, e.g., Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989) (movement to a different room in the same building), *Bennett, supra.,* (movement to a different location a few miles away).[2]

2. In relation to the issues discussed above, Appellant also argues that trial counsel was ineffective in failing: 1) to determine the facts regarding his detention in Ohio; 2) to file a motion to suppress his statement to the police; and 3) to file a motion to suppress the physical evidence obtained as a result of that statement. Since we have already resolved the merits of the issues underlying these claims of ineffectiveness against the Appellant, we find that there was no ineffectiveness on the part of trial counsel. It is reasonable for counsel to decline to file motions or enter objections which are

Appellant argues next that trial counsel was ineffective in failing to object to the dismissal of juror Kucharski and the impaneling of juror Gallagher. Appellant's arguments in this regard are without merit.

■ The Pennsylvania rules of criminal procedure state that "[i]n capital cases, the individual voir dire method must be used, unless the defendant waives that alternative". Pa.R.Crim.Pro. 1106. Regarding the "individual" method of voir dire, the rule provides as follows:

> (B) Challenges, both peremptory and for cause, shall be exercised alternately beginning with the attorney for the Commonwealth, until all jurors are chosen. Challenges shall be exercised immediately after the prospective juror is examined. Once accepted by all parties, a prospective juror shall not be removed by peremptory challenge. Without declaring a mistrial, a judge may allow a challenge for cause at any time before the jury begins to deliberate, provided sufficient alternatives have been selected, or the defendant consents to be tried by a jury of less that twelve pursuant to rule 1103.

The purpose of voir dire is to secure a competent, fair, impartial and unprejudiced jury. The scope of voir dire rests in the sound discretion of the trial court and will not be reversed on appeal in the absence of palpable error. *Commonwealth v. Smith,* 518 Pa. 15, 540 A.2d 246 (1988).

In this case prospective juror Kucharski was questioned by the Commonwealth and accepted as a juror. Kucharski was then questioned by defense counsel and revealed that he was confused as to the meaning of premeditation. After the juror was accepted by the defense he was reexamined by both the Commonwealth and the Court. During this questioning Kucharski stated that he would be unable to follow the Court's instructions as to the legal definition of

without merit, reasonably certain to fail, or unsupported by law existing at the time of the proceedings. *Commonwealth v. Roach,* 479 Pa. 528, 388 A.2d 1056, 1057 (1978). Moreover, Appellant has not met his burden of showing that he was prejudiced by counsel's omissions. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

258

premeditation. Thus, the court permitted the Common-
wealth to challenge Kucharski for cause.

▮ Appellant, now argues that since "challenges for
cause must be exercised immediately after the prospective
juror is examined", trial counsel was ineffective in that he
should have objected when the trial court permitted juror
Kucharski's re-examination, challenge for cause and dismis-
sal. This is incorrect. Challenges for cause may be exer-
cised at any time before the jury begins to deliberate.
Pa.R.Crim.Pro. 1106(e)(1)(B). Since juror Kucharski's quali-
fication was brought to issue after he was questioned by
the defense, the Court did not abuse its discretion in permit-
ting his re-examination, challenge for cause, and dismissal.

Similarly, there was no abuse of discretion in impaneling
juror Gallagher. After Gallagher was accepted as a juror
by both parties the trial court granted the Commonwealth's
belated peremptory challenge and Gallagher was advised
that she was excused from jury service. The trial court,
after a discussion in chambers with both counsel present,
reversed his previous ruling relying on Rule 1106 which
prohibits peremptory challenges after the juror has been
accepted by both parties. The trial court contacted Galla-
gher at home, determined that she had not discussed the
case with anyone, advised her that he erred in dismissing
her, and seated her on the jury.

▮ Appellant argues that counsel was ineffective in that
he should have objected to the procedure used by the trial
court because Appellant was not present in chambers and
juror Gallagher was not under oath when the trial court
questioned her on the telephone. In *Commonwealth v.
Boyle*, 498 Pa. 486, 492 at n. 7, 447 A.2d 250, 253 at n. 7
(1982), we noted that "[a] defendant's presence in chambers
and at sidebar is not required where he is represented by
counsel". Regarding the possibility that juror Gallagher
may have lied when she stated that she had not discussed
the case with anyone, we note our long-standing rule that
we do not consider claims of ineffectiveness in a vacuum.

*Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981). Appellant has offered no basis for questioning the qualification, impartiality or fairness of juror Gallagher.

■ Appellant argues next that the evidence was insufficient to support the jury's finding of the aggravating circumstance that "[t]he offense was committed by means of torture". 42 Pa.C.S.A. § 9711(d)(8).[3] Appellant asserts that his conduct did not show exceptional depravity nor did it establish his intent to cause pain and suffering to the victim. Appellant also suggests that the crime was not "set apart from the norm of capital felonies." *Commonwealth v. Pursell,* 508 Pa. 212, 239, 495 A.2d 183, 196 (1985). We disagree.

In *Pursell* this Court held that torture is "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity". *Id.* Additionally, we stated that:

> When the means of torture are employed, we can believe, without a reasonable doubt, that the user of such means intended to torture his or her victim to death. What is intended to be included are those murders of the first degree where the actual commission of the offense included such concurrent acts as to set the crime apart from the

---

**3.** At the Sentencing Hearing the Commonwealth argued, in addition to the aggravating circumstance that the offense was committed by means of torture, 42 Pa.C.S.A. § 9711(d)(8), that the Appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S.A. § 9711(d)(6). The jury found both of these aggravating circumstances. Appellant offered as mitigating circumstances his underprivileged background and past work history, 42 Pa.C.S.A. § 9711(e)(8), his lack of a significant history of prior convictions, 42 Pa.C.S.A. § 9711(e)(1) and the fact that he acted under the substantial domination of another, 42 Pa.C.S.A. § 9711(e)(5). As mitigating circumstances the jury found and listed the following: "underprivileged background—childhood", "prior employment history and lack of known convictions for a fourteen-year period," and "influenced by another". T.T., March 20, 1986, at p. 423. In weighing the circumstances the jury determined that the aggravating circumstances outweighed the mitigating circumstances and, thus, sentenced Appellant to death.

norm of capital felonies—the consciousless or pitiless crime which is unnecessarily painful to the victim.

*Id.,* 508 Pa. at 239, 495 A.2d at 197.

Dr. Leon Rozin, the forensic pathologist who performed the autopsy in this case, testified that the victim suffered a total of fifty-seven stab wounds, fourteen to the face and head, thirty-three to the trunk, and ten to the limbs (including three defensive wounds to the hands). Dr. Rozin, who had performed several hundred autopsies in homicide cases, stated that he had never before performed an autopsy on an individual who was stabbed as many as fifty-seven times.

The fourteen wounds to the victim's face and head included several punctures of the left ear. Of the thirty-three wounds to the trunk of the body, six were located on the anterior (front) of the chest, two of which penetrated the lungs. Each of eight wounds to the posterior (back) and lateral (side) portions of the chest, produced eight additional tracts going into the lungs. Dr. Rozin testified that the victim survived for at least twenty to sixty minutes following this brutal assault.

We find that there was sufficient evidence in this case for the jury to determine that the offense was committed by means of torture. It is clear that the victim in this case sustained considerable pain and suffering. The conduct of the Appellant was indeed atrocious and from his acts it can be inferred that he intended to cause such pain and suffering. Finally, it is absurd to suggest that the murder of an eighty-four year old man by repeated, unrelenting, and unnecessary stabbing is by any stretch of the imagination the "norm" in capital felonies.

In relation to the above claim, Appellant also argues that the trial court's instruction to the jury regarding torture was defective because it did not include the statement that "torture is the intentional infliction of pain and suffering" and that trial counsel was ineffective in failing to object to the instruction.

In *Pursell*, 508 Pa. 212, 239, 495 A.2d 183, 197 (1985), we held that the charge to the jury on the definition of torture was "correct and enabled the jury to understand the law on this issue". The trial court in that case provided the jury with two definitions of torture:

> One of them is the model Penal Code in which they say that the offense or murder committed by means of torture is designed for the defendant who causes *considerable amount of pain* and that the language used for this particular aggravating circumstance is *the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity.* Also, another place that I felt may be appropriate in trying to define for you torture was in the American Law Reports. These reports stated that since murder is an intentional act, that many courts have determined, regarding murder by torture, a specific intention that the torture murderer has in committing the homicide. It has been held that this is an *intention to inflict pain, suffering or both pain and suffering.* January 26, 1982, pp. 145–149.

*Id.*, 508 Pa. at 239 n. 13, 495 A.2d at 197 n. 13 (quoting charge of trial judge) (emphasis added). Subsequent to our decision in *Pursell*, in *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728, 737 (1987) and *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987) we referred to the second definition of the trial court's instruction in *Pursell* and held that the definition of torture is the "intentional" infliction of pain, suffering or both pain and suffering on the victim. *Nelson* and *Crawley*, supra.

In this case the court charged the jury as follows:

> A second possible aggravating circumstance is that the offense was committed by means of torture. You have heard that question argued to you. The law does not define torture, beyond merely the words that I have explained to you. However, our Supreme Court has attempted to gather to give some further definition to that term. It does not simply mean torture in the sense

that we think of being burned at the stake or placed on the rack, or something like that.

To apply that aggravating circumstance, you must find that the killing was perpetrated by means of torture. And as I said, the Supreme Court has interpreted the word torture as used in the statute as the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or callous, manifesting exceptional depravity.

 The trial court utilized this Court's definition of "torture" as set forth in *Pursell, supra.* The trial court's definition did not include a statement that torture is the "intentional" infliction of pain and suffering on the victim. However, our decisions in *Nelson* and *Crawley* had not yet been decided at the time of the sentencing hearing in this case. Additionally, this is not a case like *Nelson* or *Crawley* where the trial court gave no definition of torture, nor is this a case where the jury was called upon to find such aggravating circumstance on sparse or speculative evidence of torture. *See, Nelson,* 514 Pa. 262, 523 A.2d 728 (1987) (Larsen, J. concurring and dissenting). The definition of torture used in this case was sufficiently guiding to prevent the arbitrary imposition of the death penalty. Counsel was not ineffective in failing to object to an instruction which set forth the prevailing definition of torture at the time of the sentencing hearing.[4]

4. Appellant raises several additional claims of ineffectiveness including that counsel was ineffective: in failing to question Appellant's extradition from Ohio; in not permitting Appellant to proceed non-jury; in following a particular defense strategy; and in not preparing properly for the sentencing phase. We find each of these arguments meritless. Additionally, Appellant asserts that counsel was ineffective in failing to object when the trial court permitted the jurors to read a transcript of Appellant's tape recorded confession while the tape was being played in court. The record reveals that counsel did object to this procedure. However, we find no abuse of discretion in the use of this procedure and have previously sanctioned the same. *Commonwealth v. Rodriguez,* 519 Pa. 415, 548 A.2d 1211 (1988) (transcript read by jurors during playing of tape recording); *Commonwealth v. Stetler,* 494 Pa. 551, 431 A.2d 992 (1981) (transcript read to jury immediately before playing of tape recording).

Having reviewed the entire transcript of the proceedings including sentencing, we conclude that the sentence of death in this case was not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S.A. § 9711(h)(3)(i), and that the evidence plainly supports the jury's finding of the aggravating circumstances that the killing was committed during the perpetration of a felony and that the offense was committed by means of torture, 42 Pa.C.S.A. § 9711(h)(3)(ii). Upon considering the circumstances of this crime, and the character and record of the accused, 42 Pa.C.S.A. § 9711(h)(3)(iii), together with the data and information compiled by the Administrative Office of Pennsylvania Courts as to the penalty imposed in similar cases, *See, Commonwealth v. Frey,* and appendix attached thereto, 504 Pa. 428, 475 A.2d 700 (1984), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we conclude that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases.

The judgement of sentence is affirmed.[5]

NIX, C.J., and ZAPPALA, J., concur in the result.

---

5. The Prothonotary of the Eastern District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S.A. § 9711(i).