980 A.2d 35

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Jerry CHAMBERS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2008.

Decided Sept. 30, 2009.

226

228

Jules Epstein, Esq., Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for Jerry Chambers.

William George Young, Esq., Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, MCCAFFERY and GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of Philadelphia County on May 26, 2005, for the murder of three-year-old P.B.[1] Appellant Jerry Chambers was convicted by a jury of first-degree murder, criminal conspiracy, aggravated assault, four counts of endangering the welfare of a child, four counts of conspiracy to endanger the welfare of a child, three counts of indecent assault, three counts of indecent exposure, three counts of corruption of a minor, and possession of an instrument of crime, following a capital murder trial that commenced on May 2, 2005. Because we find the issues raised by appellant either unreviewable or without merit, we affirm the convictions and judgment of sentence.

The myriad charges in this case arose out of the abuse of P.B. and her three sisters, which culminated on the night of August 16, 2003, when appellant caused the death of P.B. Evidence presented at trial established that in 2002, appellant was living in an apartment located at 1705 South 5th Street in the City of Philadelphia. Tiffany Bennett, the mother of four girls, P.B., age three, P.B.2., age four, A.B.2., age six, and A.B., age ten, knew appellant and his brother, Jason Chambers ("Jason") from the neighborhood. Bennett met appellant and Jason in 1999, when she moved into the neighborhood to live with her mother. Jason and appellant paid Bennett to braid their hair, and Bennett's daughters played with Jason's children. Notes of Testimony ("N.T."), 5/13/05, at 64–67. Bennett found appellant to be "a nice guy. I didn't see anything wrong with him." N.T. 5/13/05, at 67. Bennett initially asked Jason to babysit the girls, and he did so for some period of time. Precisely when appellant began babysitting the girls is unclear; however, the girls were in his care by the fall of 2002. Appellant babysat the girls during Bennett's work hours, from 4:00 p.m. until midnight.

1. Consistent with 42 Pa.C.S. § 5988, we avoid revealing the names of the children in cases where physical assault or abuse is implicated.

The house at 1705 South 5th Street contained three apartments. Jason Chambers lived on the second floor with his two sons, Jayshawn and Jayshine. A woman named Jennifer and her son lived on the third floor, while appellant shared the first floor apartment with Ruth Leonard, whom he called his "godmother." Bennett's sister, Candice Geiger, was also living with appellant and Ruth on the first floor. When Bennett first began leaving her children with appellant she was unaware that her sister Candice was living with appellant; however, even after Bennett discovered that her sister was living in the house with her daughters, she never discussed their care or welfare with her.

Bennett initially paid appellant $60.00 per week to watch the girls. The girls were in appellant's apartment for approximately eight hours per day, from 4:00 p.m. until after midnight, when Bennett picked them up and took them to her home. Prior to Thanksgiving of 2002, however, appellant suggested that it would be better for the girls to stay the night at his apartment rather than go home at 1:00 or 2:00 a.m. Bennett agreed, and began to pay appellant $80.00 per week for babysitting. At this point, Bennett's interaction with the children became less frequent and she largely stopped visiting them at appellant's apartment or taking them home for weekends or special occasions. Someone from appellant's house would come to her work to get the babysitting money, or she would drop the money off during her lunch break. Bennett spent an hour or so with her children on Christmas Day; then, between Easter and August 17, 2003, she did not see her children at all. In June of 2003, appellant asked Bennett to take her children back, to which she replied, "I don't want the kids." N.T., 5/12/05, at 150.

The children lived in deplorable conditions. The apartment consisted of two bedrooms, a bathroom, a living area, and a kitchen. It was filthy and infested with flies and cockroaches. An overwhelming stench of urine permeated the dwelling. N.T., 5/3/05, at 15. The front bedroom was occupied by Ruth Leonard, while the girls shared the back bedroom with appellant and Geiger. There were two doors to the bedroom. One

was nailed shut, and the other was stripped of its latch mechanism, and could only be opened by a key. The bedroom was furnished with two beds: one, next to the radiator, for the children; the other for appellant and Geiger. There was a child's potty overflowing with urine and feces on the floor. There was also feces on the floor around the room, particularly by the children's bed. The single window was covered with dark plastic, and on the wall were taped six pieces of paper listing "Rules for this room." *Id.*, at 24. Rules one through six instructed the children in their daily chores, while rule seven mandated that everyone "[r]espect [appellant] at all times or every body [sic] gets their ass whooped." *Id.*, at 25.

Appellant regularly beat the four girls with extension cords, belts, a metal pole, and a broomstick. N.T., 4/20/04, at 22–24, 39.[2] The girls were so severely bruised from the beatings that appellant did not permit them to leave the apartment, even to go to school. If anyone visited, appellant locked the girls in the bedroom or made the girls cover their faces and bodies. When P.B. wet the bed, appellant made A.B. put the three-year-old in a cold shower. To keep P.B. from getting too cold, A.B. would get into the shower with her. N.T., 4/22/04, at 26. The girls were also locked in the basement with appellant's two pit bulls as punishment, and were fed sporadically and inconsistently. At times, they were forced to eat "dog poop" out of the dogs' food bowls. N.T., 4/20/04, at 11–12, 25.

On the night of August 16, 2003, appellant beat P.B. with an extension cord while she was in the shower. Later, he locked A.B. in the basement, and he, Geiger, P.B., A.B.2, and P.B.2 went to bed. Some time after midnight, appellant and Geiger were having sex when appellant noticed P.B. looking at them. Appellant told her to stop watching, but, when she did not comply, appellant called her over to his bed, beat her with an extension cord, and struck her in the face several times with his hand. Geiger also beat P.B., then appellant picked her up by her feet and threw her across the room. P.B. struck her

2. Appellant's trial began on May 2, 2005. The testimony of A.B., P.B.2, and A.B.2 was recorded in April of 2004 in closed proceedings and played at trial via videotape.

head on the cast-iron radiator and ended up lodged between the bed, radiator, and wall. She remained there, slowly suffocating, until the next day. Appellant did nothing to help the child; further, he instructed the other girls not to help her. N.T. 4/22/04, at 56.

Around 1:00 p.m. the next day, Jason called the police and told them that P.B. was not breathing. Firefighters dispatched to the apartment found P.B. laying face up on a sofa. Despite realizing that P.B. had been dead for some time, the EMTs attempted to resuscitate her. She was later pronounced dead on arrival at Methodist Hospital.

When police officers arrived at the scene, appellant and Geiger calmly falsified a story that they had put the children to bed at 9:00 p.m. the previous evening, and that when they awoke around 1:00 p.m. the next day, they found P.B. between the wall and the bed. They reported that P.B. was unresponsive when they found her. N.T. 5/10/05, at 75, 77, 81.

Later that day, police found A.B. hiding on the third floor of the building with her head wrapped in a towel. When the towel was removed, the officers found that her eyes were swollen shut and her face so badly beaten that they could not determine her sex. A.B., A.B.2, and P.B.2 were taken to the Children's Hospital of Philadelphia for treatment. The girls were interviewed by police officers at Children's Hospital.

A.B.2 was interviewed at the hospital by Detective Richard Reinhold. She stated that appellant had beaten P.B. with an extension cord the night before and that, later that night, appellant again beat P.B. and threw her into the radiator for looking at him and Geiger in bed. She stated that after appellant threw P.B. into the radiator, he "took her off the radiator and threw her behind the bed." N.T., 5/3/05, at 174. A.B.2 also informed Detective Reinhold that Geiger had instructed her to tell the police that appellant "treated us right, but he didn't." N.T., 5/3/05, at 174. She maintained that appellant and Geiger frequently beat them and withheld food, and that on the night that P.B. died A.B. was locked in the

basement after having been severely beaten the day before. N.T., 5/3/05, at 174.

A.B. was interviewed by Detective James Owens. A.B. told Detective Owens that "a man" came into the apartment and fought with appellant, and that P.B. fell behind the radiator during the fight and suffocated. A.B. also stated that her own injuries were inflicted by appellant, who beat her because "he thought I did something wrong to my sister." She also indicated that appellant regularly beat her, A.B.2, and P.B.2, but not P.B., and that the police were not called until 1:00 p.m. the next day because "the phone wasn't charged," and because Geiger "didn't have minutes on her cell phone." N.T., 5/4/05, at 86. A.B. later testified at trial that appellant had instructed her to lie about what happened to P.B., and to tell police that a strange man had broken into the apartment and fought with appellant. N.T. 4/20/05, at 20–21.

A.B. was interviewed at the hospital a second time, on August 19, by Detective Aaron Booker. During this interview, A.B. revealed that appellant frequently locked her in the basement so visitors to the house would not see her injuries, and that she had not been to school for a month. She stated that after P.B. was killed, appellant instructed her to hide on the third floor and that, if the police found her, she was to tell them that her injuries were due to a fall. She also stated that appellant had beaten P.B. the night of her death, and that appellant had made her stand in Ruth Leonard's bedroom with Ruth while P.B. was being beaten. N.T. 5/4/05, at 128–132.

Warrants for the arrest of appellant, Geiger, and Bennett were issued on August 22, 2003, and the charges against each defendant were consolidated for a single joint trial before the Honorable Renee Cardwell Hughes. The trial commenced on May 2, 2005, and concluded on May 17, 2005.

At trial, the Commonwealth presented medical testimony from Dr. Ian Hood, the deputy chief medical examiner for the City and County of Philadelphia. Dr. Hood testified that P.B. was below normal height and weight for her age, and that she

was "very scrawny, very thin, with loose folds of skin that indicated that she had been heavier at some point in time" and then lost that weight in a short period of time. N.T., 5/2/05, at 16. Dr. Hood testified that "[t]he most significant finding about this child was just everywhere you looked on the skin, there was a mark or bruise of a varying age." The marks and bruises were of various shapes, indicating that they were inflicted with different instruments. The instruments identified by Dr. Hood were two different kinds of belts and buckles, looped cords, and "a couple of patterned, fairly nasty scars that had completely depigmented the skin and were made with something that was about the size of [a] knuckle." He was unable to determine the exact number of injuries because "the problem in documenting the bruises, the scars, and the abrasions on this child was that many of them did overlap and coalesce." He estimated thirty to forty areas of injury, and significantly more individual bruises. The most recent of her injuries were inflicted the night of her death, while the oldest were a minimum of two months old. N.T., 5/2/05, at 16–18, 20–21, 33, 71.

P.B. had a recently-inflicted bruise on her left forehead, another around her left eye, and a third underneath her left eyebrow. There were a series of bruises over the left side of her face, caused by "knuckles or fingers from an adult hand." Another, similar bruise was on the right side of her face. Describing the injuries to P.B.'s head, Dr. Hood noted that P.B. had thick braids that were "very protective," but that her scalp was still bruised and abraded in a number of places. N.T., 5/2/05, at 23–24. Dr. Hood speculated that the scalp injuries could have come from being struck with a hard object or being propelled into an object. Her forehead was marked with a pattern of bruises and indentations consistent with the radiator.

The internal examination revealed further bruising throughout P.B.'s head and body, and internal injuries. P.B.'s liver had undergone "sudden forceful compression" and had ruptured and begun to split apart. Dr. Hood testified that the blood loss from the ruptured liver would not normally have

been fatal in and of itself, but given P.B.'s malnourished and weak condition, "it would be certainly capable as acting as the straw that broke the camel's back." *Id.*, at 39. Consistent with her malnourished state, P.B.'s thymus gland was shrunken. Dr. Hood testified that the state of her thymus gland indicated that she had been under physical stress for a significant period of time.

In addition to the physical abuse, Dr. Hood also determined that P.B. was suffering from a condition called "inanition," in which, due to severe physical or emotional stress, a child begins to literally waste away. Inanition is a "peculiar condition" specific to neglected and abused infants or children, and is characterized by malnourishment and a shrunken thymus gland. P.B. was "off the bottom of the chart" for a normal three-year-old's height and weight. P.B. also exhibited a condition called lanugo hair, a growth of body hair typical in infants and in older children suffering from inanition. N.T. 5/2/05, at 39–41.

Dr. Hood further testified that it took several hours for P.B. to die, but also stated that it was difficult to assign a single cause of death. Instead of a single cause of death such as blunt head trauma or exsanguination from her ruptured liver, he opined, P.B.'s death was due to multiple factors, including the multiple blunt force traumas she suffered, inanition, and asphyxia from lying "crumpled up in a heap" jammed between the bed, the wall, and the radiator. "Putting all of that together, the multiplicity of the blunt trauma, the obvious stress the child had been under, I finally assigned her cause of death as multiple blunt trauma, asphyxia, and inanition. It really was a combination of all three things." The manner of death was homicide. N.T., 5/2/05, at 57–59, 63.

A.B.2 and A.B. testified via video. A.B.2 testified that she witnessed appellant grab P.B. by her feet and throw her across the room. She stated that P.B.'s head hit the radiator, and that appellant took her off the radiator and threw her behind the bed. A.B. testified that when she was first interviewed by the police at Children's Hospital, she had withheld the truth about the extent of the abuse and the events the

night of P.B.'s death because she thought that they would be returning to the apartment after being released from the hospital. N.T., 4/22/04, at 32, 41–42.

Appellant neither testified nor presented witnesses. On May 20, 2005, the jury returned a verdict of guilty of first-degree murder, conspiracy, aggravated assault, four counts of endangering the welfare of a child, four counts of conspiracy to endanger the welfare of a child, three counts of indecent assault, three counts of indecent exposure, three counts of corruption of a minor, and possession of an instrument of crime.[3]

The penalty phase commenced on May 25, 2005. The Commonwealth incorporated the evidence introduced at the guilt phase of the trial. The defense called three witnesses: appellant's sister, his mother, and a psychologist. The jury found two aggravating circumstances: (1) that the victim was a child under the age of twelve;[4] and (2) that the offense was committed by means of torture.[5] The jury also found two mitigating circumstances: (1) that appellant had no significant history of prior criminal convictions;[6] and (2) that appellant was under the influence of extreme mental or emotional disturbance at the time of the offense.[7] The jury unanimously determined that the aggravating circumstances outweighed the mitigating circumstances, and, accordingly, returned a sentence of death. The trial court then imposed an aggregate term of imprisonment of seventy-two to 144 years for appellant's other convictions, to be served consecutively to the sentence of death. Post-sentence motions were denied, and this appeal followed.

3. Geiger was convicted of third-degree murder, conspiracy, four counts of endangering the welfare of a child, and four counts of conspiracy to endanger the welfare of a child. Bennett was convicted of four counts of endangering the welfare of a child and four counts of conspiracy to endanger the welfare of a child.

4. 42 Pa.C.S. § 9711(d)(16).

5. 42 Pa.C.S. § 9711(d)(8).

6. 42 Pa.C.S. § 9711(e)(1).

7. 42 Pa.C.S. § 9711(e)(2).

## I. Sufficiency of the Evidence[8]

 Appellant first claims that the evidence was insuffi-
cient to support his conviction for first-degree murder because
the Commonwealth failed to prove that appellant acted with
the specific intent to kill when he flung P.B. against the
radiator, left the three-year-old to suffocate, and forbade the
other children to help their sister.[9] In reviewing the sufficien-
cy of the evidence, this Court must determine whether the
evidence admitted at trial, and all reasonable inferences de-
rived therefrom viewed in favor of the Commonwealth as
verdict winner, supports the jury's finding of all the elements
of the offense beyond a reasonable doubt. *Commonwealth v.
Widmer,* 560 Pa. 308, 744 A.2d 745, 751 (2000). Evidence is
sufficient to sustain a conviction for first-degree murder when
the Commonwealth establishes that: (1) a human being was
unlawfully killed; (2) the accused is responsible for the killing;
and (3) the accused acted with specific intent. 18 Pa.C.S.
§ 2502(a); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d
1280, 1283 (2000). An intentional killing is a "killing by means
of poison, or by lying in wait, or any other kind of willful,
deliberate, and premeditated killing." 18 Pa.C.S. § 2502(d);
*Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 449
(1998). The Commonwealth may establish that the defendant
intentionally killed the victim wholly through circumstantial
evidence. *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d
131, 135 (2001), *cert. denied,* 535 U.S. 955, 122 S.Ct. 1360, 152
L.Ed.2d 355 (2002).

For sufficiency purposes, appellant readily admits he caused
P.B.'s death, and that his horrific abuse of P.B. and her
siblings was willful and malicious. He argues, however, that

8. It is this Court's practice to review the sufficiency of the evidence for
first-degree murder in all death penalty direct appeals regardless of
whether the appellant raises such a challenge. *Commonwealth v.
DeJesus,* 580 Pa. 303, 860 A.2d 102, 105 (2004), *Commonwealth v.
Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied* 461
U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *reh'g denied* 463
U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). Here, appellant
raises a sufficiency challenge.

9. Appellant does not challenge his other convictions.

the evidence establishes only a pattern of child abuse, which, in his view, precludes a finding of a specific intent to kill the child. As proof that appellant did not act with the specific intent to kill on the night of P.B.'s death, appellant points to the medical examiner's findings. Appellant argues that the medical examiner did not find that the force with which P.B. hit the radiator alone caused her death, but rather, that her death was the result of "multiple blunt trauma, asphyxia, and inanition." Appellant's Brief at 18. Appellant also cites the medical examiner's testimony as providing grounds to question the eyewitness evidence of P.B.'s sister that appellant grabbed P.B. by the feet and "smashed" her head into the radiator. Appellant argues that, because the medical examiner testified that this "final blow" would not have been sufficient, in and of itself, to cause P.B.'s death, the evidence is legally insufficient to establish first-degree murder.

Appellant points to what he characterizes as a long history of similar cases in other states, in which child abuse caused the death of a child but various appellate courts supposedly found that there was no specific intent to kill. Appellant leads with a 1920s case from the New York Court of Appeals in which a father strangled his three-year-old daughter. The Court of Appeals remarkably stated, in that case, that it was doubtful "whether the defendant intended to kill his daughter; . . . it is far more consistent with the evidence that she died as a result of his bad temper and brutal chastisement without any intent to cause her death." *People v. Ingraham*, 232 N.Y. 245, 133 N.E. 575, 576–77 (1921). Appellant also cites to an Arkansas Supreme Court decision in which the appellant's conviction for first-degree murder was overturned on sufficiency grounds. Appellant's Brief at 19 (citing *Midgett v. State*, 292 Ark. 278, 729 S.W.2d 410, 411 (1987) (concluding that regular and severe beatings the appellant inflicted upon his son evidenced intent to cause serious physical injury, but not to kill)). In addition, appellant cites to cases from Tennessee, California, and Oklahoma. *Id.* at 19–21. From these cases, appellant asks that we adopt a bright-line rule that evidence of the abuse of a child, no matter how severe, is

legally insufficient, in and of itself, to support a finding of first-degree murder.

Appellant argues that some additional proof, above and beyond the deadly physical abuse of a child, is required. As examples of such additional proof, appellant suggests a verbal confession by the abuser that his or her intent was to cause the child's death, or some action from which the only possible outcome was death. In fact, appellant goes a step further in his conclusions, arguing that the fact of abuse itself should be deemed to negate a finding of specific intent to kill because the goal of all abusers, supposedly, is to punish and to continue the abuse. Killing the victim, appellant argues, would actually deprive the abuser of one of his chief pastimes and a primary emotional outlet; thus, it would be counterintuitive to find that the abuser intended to kill the victim.

Appellant bolsters this argument by pointing to this Court's decision in *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519 (2003). In *Tharp*, we affirmed the appellant's conviction for first-degree murder arising out of the starving death of her daughter. Appellant argues that the evidence in *Tharp* was sufficient to sustain a verdict of first-degree murder because Tharp made statements confirming her intent to kill her daughter and engaged in a course of conduct "that could only lead to death," *i.e.* starvation. Appellant's Brief at 24. Additionally, appellant argues that Tharp evidenced her guilt by hiding her daughter's body and informing the police that she had been kidnapped. By contrast, appellant observes that there was no evidence that he made statements indicating that he intended to kill P.B. and he never attempted to conceal her body, and he argues that P.B. could potentially have survived the abuse that he inflicted upon her. While the trial court held that the jury could conclude that appellant intended to kill P.B. solely from the fact that appellant threw P.B. into the radiator and left her to suffocate, appellant maintains that absent proof that it is "common knowledge" that those actions will result in the death of a child, the evidence was insufficient to support the verdict.

The Commonwealth responds that the evidence was more than sufficient to support the jury's verdict, arguing that appellant's argument amounts to a request that this Court reweigh the evidence and substitute its factual findings for those of the jury. The Commonwealth characterizes appellant's sufficiency argument as merely an attempt to recast the evidence in a light more favorable to appellant, arguing that appellant's portrayal of the facts in his appellate brief is "far different from the one the jury heard and the evidence established." Commonwealth's Brief at 19. The facts received by the jury, the Commonwealth notes, include evidence that appellant repeatedly beat P.B. on the night of her death, then threw her headfirst across the bedroom into a cast iron radiator. Ordering A.B.2 not to help her sister, appellant then left P.B. to suffocate. From this evidence, the Commonwealth urges that the jury could reasonably conclude that appellant had formed the specific intent to kill P.B. when he picked her up and threw her into the radiator.

The trial court found that the evidence was sufficient to establish the specific intent to kill, and that the jury had two independent factual bases upon which to base its finding of specific intent. According to the trial court, specific intent could be sustained solely on the basis of the testimony that appellant picked up three-year-old P.B. by her feet and threw her across the room and into the radiator. The trial court also found, however, that the finding of specific intent could be sustained on the basis of appellant's course of conduct towards P.B.

We agree that the evidence was sufficient to warrant the jury in finding first-degree murder. It is true that the medical examiner testified that a healthy three-year-old could have survived being thrown across the room and into the radiator. However, the fact that another child could have survived the act did not prevent the jury from finding that appellant acted with the specific intent to kill. Rather, it simply indicates that, had circumstances been wholly different, appellant may not have succeeded in his attempt. Moreover, appellant did more than throw the child into the radiator: he

also hit the child, picked her up after throwing her into the radiator, and threw her between the bed and the wall. For good measure, appellant also ordered the child's sister not to help her get up, then left the child in that condition for hours. In short, there is no factual predicate for a "single-act" theory.

In any event, sufficiency review requires examining the entire record. The jury could find that appellant's intent to kill P.B. was further proven by the course of conduct that culminated on the night of her murder. In arguing that the evidence was insufficient because P.B.'s death was caused by suffocation rather than solely by the impact with the radiator, appellant asks this Court to draw different inferences than those available to the jury. We recently rejected a similar "one-blow" argument in *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406 (2008), which was decided after the case *sub judice* was briefed. In *Powell*, this Court held that a pattern of child abuse, culminating in an hours-long beating that ended in the child's death, was sufficient to sustain the jury's finding of specific intent to kill despite the medical examiner's inability to point to a "final blow" that definitively caused the child's death. In that case, the victim's death was brought about by a seizure, to which the child was predisposed due to the repeated beatings and blows to the head that Powell had inflicted on him. While the child may have survived the final beating absent this preexisting condition (inflicted by Powell), we nonetheless concluded that the evidence overwhelmingly supported a finding of specific intent to kill.

The evidence in this case, shorn of the defense inferences appellant urges us to draw, revealed that appellant inflicted severe abuse upon P.B. and her sisters that logically culminated in a final event that brought about the child's death. After starving and abusing her for months, appellant repeatedly beat P.B. on the night of her death. Later that night, when P.B. disobeyed him by looking while appellant and Geiger engaged in sex, appellant called the three-year-old over, hit her repeatedly, picked her up, threw her across the room into a cast-iron radiator, then picked her back up and threw her between the bed and the wall. Appellant then instructed

P.B.'s older sister not to help her get up, from which the jury could infer that appellant knew that P.B. was unable to move or to help herself. While appellant and Geiger returned to their sexual activities, unconcerned about the helpless child's predicament, P.B. remained wedged behind the bed and radiator for hours, apparently unable to extract herself due to her injuries and weakened condition, and slowly suffocating. There P.B. remained until the next day, when Jason called the police at 1:00 p.m. in the afternoon. In the meantime, appellant went about instructing the other children to lie to the police.

From this evidence, the jury could reasonably conclude that, even if appellant had not intended to kill P.B. when he beat her with belts, extension cords, and a broom handle, made her stand in front of an air conditioner after beating her in a cold shower, withheld food, forced her to eat "dog poop," locked her in a room with two pit bulls, and isolated her from any outside person who may have noticed the abuse, he formulated the intent to kill when he threw her into the radiator, left her to suffocate, and forbade others to help her. The fact that appellant argues that he "only" intended to abuse P.B. in the days before her murder does not mean the jury was obliged to believe that theory (for which there was no testimonial support), nor does it somehow negate a finding that he decided later to kill her. Further, the fact that a single blow would not have killed the child had the child not been in a weakened state does not show that appellant did not **intend** to kill the child, only that, absent the history of abuse, he may have been unsuccessful in this particular attempt.

We also specifically reject appellant's invitation to view child abuse murders as subject to some special sufficiency review "paradigm" which apparently would require enhanced proof—such as a confession—of specific intent. The statute draws no such distinction and the rule appellant poses would negate the jury's function. The jury is no less able to measure the totality of the circumstances against the settled definition of specific intent in child-abuse murders than it is in

other first-degree murder prosecutions. Furthermore, appellant's attempt to characterize *Tharp* as establishing this heightened standard ignores that fact that, while *Tharp* held that the evidence was sufficient to establish sufficient intent under its specific circumstances, *Tharp* did not purport to render a legislative-type determination that only those circumstances could be sufficient. Indeed, imposing such a standard would be absurd, considering the multiplicity of ways in which abusers can torment, and ultimately kill, their victims. *Tharp* illustrates one factual record supporting a specific intent to kill. It is not an exclusive formula.

We also are not persuaded by appellant's citation to cases from other jurisdictions, from which appellant would extrapolate his heightened child abuse paradigm respecting proof of specific intent. Within broad constitutional parameters, the states are free to define crimes as they see fit. In addition to the fact that these cases do not bind us, select references to individual case circumstances means little absent some understanding of the way a state approaches first-degree murder. For example, in *State v. Brown,* a case prominently discussed by appellant, the Tennessee Supreme Court held that "the deliberation necessary to establish first-degree murder **cannot** be formed in an instant." *State v. Brown,* 836 S.W.2d 530, 543 (Tenn.1992). The Arkansas Supreme Court employed similar reasoning in *Midgett v. State,* 292 Ark. 278, 729 S.W.2d 410 (1987), another case appellant relies upon. But, it is well-established in Pennsylvania law that the specific intent to kill can be formed in a fraction of a second, and may be found whenever the defendant acts with a conscious purpose to bring about the death of the victim. *See, e.g., Commonwealth v. Fisher,* 564 Pa. 505, 769 A.2d 1116, 1124 (2001); *Commonwealth v. Mason,* 559 Pa. 500, 741 A.2d 708, 713 (1999). Beyond that, in Pennsylvania, it is a jury question. Further, *Midgett,* decided by the Arkansas Supreme Court in 1987, was overturned by statute one year later when the Arkansas legislature responded to *Midgett's* reasoning by amending the first-degree murder statute to include "knowingly causing the death of a person fourteen or younger

under circumstances manifesting cruel and malicious indifference to the value of human life." *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768, 773 (1996) (finding *Midgett* inapplicable to instant child-abuse murder case because of change in first-degree murder statute). In any event, as we have noted, the evidence here showed not only a specific blow, but immediate prior abuse, a failure to so much as check on the child, and appellant's forbidding the victim's sister from going to her assistance. Murder cases inevitably are fact-driven, and the attempt to extrapolate some broad rule fails when it does not account for all of the circumstances.

Similarly unpersuasive is appellant's reliance on *People v. Ingraham.* First, *Ingraham* did not grant the relief or establish the rule appellant seeks here; rather, the *Ingraham* court granted relief on a claim attacking the **weight of the evidence** and remanded for a new trial, permitting another jury to pass on the evidence. *Ingraham*, 133 N.E. at 576–77. Moreover, to the extent that the New York Court of Appeals can be read to be suggesting, as a matter of law, that choking the life out of a child—which required the application of force for three to five minutes—**cannot** prove specific intent, we view it as either unpersuasive, or perhaps, an uncomfortable remnant of an earlier time in another place.

As for appellant's argument that the jury could not find that he acted with the specific intent to kill because it is not "common knowledge" that throwing a three-year-old child into a radiator will result in that child's death, once again, this argument fails to come to terms with the entirety of the evidence. Moreover, the jury, which is free to bring its own common sense to bear upon its task, may well have a different view of what is "common knowledge."

 Finally, appellant argues that, in addition to being infirm under Pennsylvania's definition of first-degree murder, the evidence here was "constitutionally deficient" because it did not prove his guilt beyond a reasonable doubt. Notably, the child abuse cases from other jurisdictions appellant has cited do not purport to be premised on federal law. In any

event, as appellant realizes, the federal due process command is that evidence be sufficient beyond a reasonable doubt. For the reasons above stated, we find that the totality of the evidence, viewed in the light most favorable to the Commonwealth, amply proved specific intent to kill beyond a reasonable doubt.

## II. Trial Court Error In Charging the Jury

 Appellant next claims that the trial court erred in issuing a "course of conduct" charge to the jury as a basis for finding specific intent to kill. The instruction given was as follows:

When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding the person's words and conduct and the attending circumstances that may show state of mind, including course of conduct. The Commonwealth may prove the specific intent to kill necessary to support a first-degree murder charge by circumstantial evidence of course of conduct. If you find there is evidence that tended to show a course of conduct involving [P.B.], the length of time involved in this case, and the acts which occurred during the course of that time are factors that may be properly considered in determining whether the defendant had the required premeditation and deliberation. That separates first-degree murder from other types of murder or manslaughter.

N.T., 5/17/05 at 33.

Appellant's very brief argument mimics his sufficiency claim. Appellant argues that the charge was inappropriate because he does not believe that his abuse of P.B. was a "factual predicate" establishing that he intended to kill her. Appellant offers two hypothetical situations as examples of fact-patterns that would, in his view, establish such a factual predicate for the charge: first, a situation in which the defendant's course of conduct could **only** result in death; and second, a circumstance where the defendant explicitly expresses his or her desire to kill the victim. Appellant points to *Tharp, supra,* as an example of both hypothetical situations

because the defendant there expressly stated that she intended to kill the victim, and because starvation "inevitably" leads to death. In contrast to the *Tharp* scenario, appellant argues that the trial record here is devoid of any evidence that appellant verbally expressed a desire to kill P.B.

In a related, but distinct, claim, appellant also objects to the trial court's choice of language in issuing the charge. Appellant asserts that the trial court "wrote its own" course of conduct instruction, and that the language used by the trial court misled the jury. Appellant's Brief at 28. Appellant argues that the language of the instruction conflated the supposedly separate issues of child abuse and the specific intent required for first-degree murder, and essentially allowed the jury to find that appellant possessed a specific intent to kill if it found that appellant's abuse of P.B. was deliberate and premeditated. Appellant argues that the instruction was erroneous because it did not convey appellant's view that a pattern of severe abuse, in and of itself, is insufficient to permit an inference of specific intent.

The Commonwealth responds that a direct expression of the intent to kill is unnecessary to justify a course of conduct instruction because the specific intent to kill may be proven by circumstantial evidence alone. The Commonwealth argues that *Tharp* establishes that a prolonged course of abusive conduct can be sufficient proof of the intent to kill even absent a definitive final act. The Commonwealth adds that appellant's claim regarding the wording of the instruction is waived due to appellant's failure to object at trial.

■ Taking appellant's second point first, a review of the record reveals that the Commonwealth is correct that appellant did not object to the court's wording of the instruction. Therefore, this issue is waived. Pa.R.A.P. 302(b); *Commonwealth v. Light,* 458 Pa. 328, 326 A.2d 288, 291 (1974) (failure to object to specific language of jury charge forecloses review).

However, appellant did object to the charge being given at all on the grounds that the facts of the instant case were not analogous to *Tharp, supra.* N.T., 5/16/05, 26–33. Appellant

renewed this objection during jury deliberations, in the course of a conversation between counsel and the trial court, and the trial court acknowledged that appellant's objection to the issuing of a course of conduct charge was preserved. N.T., 5/18/05, at 12.

The trial court did not err in issuing the course of conduct instruction. "When a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Commonwealth v. Hartman*, 536 Pa. 211, 638 A.2d 968, 971 (1994). Instructions on defenses or theories of prosecution are warranted when there is evidence to support such instructions. *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668, 674 (1996) (citing cases). "In examining jury instructions, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case." *Von der Heide v. Com., Dep't of Transp.*, 553 Pa. 120, 718 A.2d 286, 288 (1998). A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. *Id.*

While the instant case is factually distinguishable from *Tharp*, *Tharp* did not purport to hold that direct evidence, such as the definitive statement of purpose in *Tharp*, was necessary to sustain a finding of a specific intent to kill. Rather, *Tharp* reaffirmed that the specific intent to kill may be proved through circumstantial evidence, such as a prolonged course of conduct that logically leads to death.

Here, the medical examiner's expert testimony established that the pattern of abuse and neglect substantially contributed to P.B.'s death; the course of conduct instruction was supported by this evidence. Furthermore, the evidence showed that appellant took four young girls into his home and turned that home into a virtual torture chamber, inflicting horrific abuse upon them for months. Appellant's ongoing actions regarding the children revealed his course of conduct, which

culminated in the death of P.B. The Commonwealth argued that the jury should infer from this evidence that appellant intended not only to kill P.B., but to do so in a prolonged and painful way. Appellant now counters that the jury was obligated to infer that he took such pleasure in abusing P.B. that he would never wish to kill her and deprive himself of that pastime. Appellant was, of course, free to argue whatever inferences he chose to the jury, but the jury was equally free to disbelieve his claims. It is neither self-evident nor logical that sustained child abuse and an intention to kill are mutually exclusive. The jury in this case was free to conclude that a course of conduct involving abusing, starving, isolating and terrorizing a helpless three-year-old child indicates an intention to kill that child. We see no logical reason to transform appellant's fact-specific argument into a point of law, and to forbid future juries from drawing their own inferences from the evidence presented. Moreover, the charge properly left it to the jury to determine whether there was a course of conduct, and if so, whether that tended to prove specific intent to kill. Accordingly, no relief is warranted.

### III. Sufficiency of the Evidence for the Torture Aggravator

Turning to appellant's penalty phase claims, appellant first contends that the evidence was insufficient to support the jury's finding of the aggravating circumstance that "[t]he offense was committed by means of torture." 42 Pa.C.S. § 9711(d)(8). Appellant posits that there was no medical evidence presented establishing that P.B. suffered physical pain during the hours in which she was trapped and suffocating after appellant threw her into the radiator. He therefore argues that there was no evidence of pain and suffering and, consequently, no evidence to support a finding of torture. Appellant also argues that the trial court erred in instructing the jury that his abuse of P.B. could be considered as proof of torture. Appellant contends that evidence of the pain and suffering he inflicted over the months prior to P.B.'s death cannot support the torture aggravator because the suffering must be inflicted **concurrently** with the final event that brings

about the victim's death. Thus, in appellant's view, the acts of abuse in the months, days, and hours leading up to P.B.'s death cannot constitute acts of torture for purposes of establishing the aggravator. In his view, it is only the "single blow" to the child and her subsequent hours trapped between the bed and the wall that may be considered in assessing whether the murder was committed by means of torture. Appellant also downplays the seriousness of the abuse he inflicted upon P.B., characterizing other cases where the torture aggravator has been upheld by this court as "much more egregious." He urges this Court to find that the facts in the instant case cannot establish torture when we have held, in previous cases, insufficient evidence in "more agonizing deaths than appellant's victim suffered." Appellant's Brief at 32, 34.

The Commonwealth responds that the evidence amply supported the torture aggravator. The Commonwealth argues that the jury could consider the complete history of appellant's abuse of P.B. in determining whether the torture aggravator was present because the intent to torture is separate and distinct from the intent to kill. The Commonwealth points to this Court's decision in *Commonwealth v. Ockenhouse,* 562 Pa. 481, 756 A.2d 1130 (2000), in which we identified several factors that may be considered in determining whether the facts of a given case make out the aggravating circumstance of torture.

The trial court found that the evidence fulfilled the *Ockenhouse* factors cited by the Commonwealth and "unequivocally establish[ed] that P.B. was tortured." Trial Ct. Op. at 10. The trial court determined that the sole purpose of the physical and emotional abuse appellant inflicted upon P.B. was to cause her pain and anguish, and that the myriad wounds covering the majority of P.B.'s body clearly evidenced appellant's intent to cause pain and suffering beyond that necessary to kill.

It is an aggravating factor in a capital case if "the offense was committed by means of torture." 42 Pa.C.S. § 9711(d)(8). A murder is committed by means of torture

when the defendant "intentionally inflicted on [the victim] a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Ockenhouse*, 756 A.2d at 1136 (citing *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1099 (1998)). Torture includes the infliction of pain to punish or coerce. *Id.* Thus, to determine whether a killing "was committed by means of torture," this Court looks to several factors, including, but not limited to: "(1) the manner in which the murder is committed; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious during the episode; and (4) the duration of the episode." *Id.* at 1137. The intent to torture may be proven from the circumstances surrounding the killing. *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1289 (1996).

 Because the plain language of the statute requires that the killing be committed by "means of" torture, there must be a connection between the torture and the killing itself. The question is fact-intensive, and thus a survey of relevant cases is instructive. In some cases, the connection is temporal, as the torture aggravator is sustained by evidence that the defendant carried out the actual killing in a particularly brutal, prolonged or painful manner. Thus, in *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985), the defendant assaulted and killed a thirteen-year-old boy in a park. Prior to the victim's death, the defendant had subjected him to fifteen blows to the head with a blunt, jagged object later identified as a rock found near the body. The victim sustained bruises, a broken nose and swollen eyes. The defendant ultimately killed the victim by strangling him with a tree branch, resulting in internal hemorrhaging in the neck and a crushed windpipe. After his death, the victim's body sustained several burns on parts of his torso and trauma to the chest and scrotum.

The defendant was convicted of capital murder and sentenced to death, with the jury finding the torture aggravator as the sole aggravating factor. On appeal, the defendant

claimed that the torture aggravator was unconstitutionally vague. The defendant also challenged the sufficiency of the evidence regarding the torture aggravator.

Responding to the defendant's vagueness challenge, this Court stated that "[t]he legislature's inclusion of the means of torture as an aggravating circumstance ... is a sufficiently specific factor because we feel that the meaning of such a term is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended." *Pursell,* 495 A.2d at 196. We reasoned that "torture" is "understood as the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." *Id.* We added that, "[w]hen the means of torture are employed, we can believe, without a reasonable doubt, that the user of such means intended to torture his or her victim to death. What is intended to be included are those murders of the first degree where the actual commission of the offense included such concurrent acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily painful to the victim." *Id.* at 197. We then found that the evidence in *Pursell* was sufficient to sustain the aggravator, considering "the number of blows, the manual strangulation, the asphyxiation with a ... tree branch, the screams heard by a witness, and the continued traumatization of the body after death...." *Id.*

In *Commonwealth v. Proctor,* 526 Pa. 246, 585 A.2d 454 (1991), the defendant and his accomplice traveled from Cincinnati, Ohio, to Meadville, Pennsylvania, and found themselves without money. Defendant's accomplice knew an elderly gentleman in the area whom, she said, they could rob. The defendant and his accomplice went to the victim's home, where they talked with the victim for about half an hour, then went into the living room to watch television. The victim received a phone call and went into the kitchen, whereupon the defendant and his accomplice decided they needed to "find some kind of weapon to knock him out with." After the victim returned to the living room, the defendant went into the kitchen, found a

pair of scissors, and tucked them into his waistband. The defendant then hid and waited for the victim to come back into the room, whereupon he ambushed the victim, stabbed him with the scissors, and removed the money from his wallet. The defendant and his accomplice ransacked the house looking for more money, then fled, leaving the victim's body to be discovered by friends. The victim had been stabbed fifty-seven times. The defendant was convicted of first-degree murder and, following a penalty hearing, the jury found the presence of the torture aggravator and returned a sentence of death.

On appeal, the defendant claimed that the evidence was insufficient to support the torture aggravator, arguing that his conduct did not show exceptional depravity and did not establish his intent to cause pain and suffering to the victim. We held that the evidence was sufficient to sustain the torture aggravator because it was "clear that the victim in this case sustained considerable pain and suffering." Additionally, we noted that it was "absurd to suggest that the murder of an eighty-four year old man by repeated, unrelenting, and unnecessary stabbing is by any stretch of the imagination the 'norm' in capital felonies." *Proctor*, 585 A.2d at 461.

Because *Pursell* and *Proctor* involved killings that were committed against strangers in single, brutal episodes, the torture at issue obviously occurred simultaneously with the act of killing the victim, and the defendant's broader course of conduct towards the victim was not at issue. A direct temporal connection, however, is not necessarily commanded by the statute and our cases make clear that there is no requirement that the torture be contemporaneous with the final act causing the victim's death.

Thus, in *Commonwealth v. Heidnik*, 526 Pa. 458, 587 A.2d 687 (1991) the defendant hanged one of his victims by her wrist from a ceiling hook, fed her only bread and water, and subjected her to beatings. The victim collapsed and died after several days of this treatment. Performing its statutory review, this Court found that the evidence was sufficient to

sustain the torture aggravator. In doing so, this Court did not limit its consideration to the "final beating" that preceded the victim's death, but considered the entire, sustained course of conduct that weakened the victim and eventually killed her. *Id.* at 692.[10]

Also instructive is *Commonwealth v. Daniels,* 537 Pa. 464, 644 A.2d 1175 (1994), which found that the evidence was sufficient to sustain the torture aggravator where the defendants, prior to shooting the victim, beat him and held him in the trunk of a car for twenty-four hours. The court emphasized that evidence of torture could be found in the fact that the victim was "bound, gagged, and immobilized in the trunk of his own car, terrorized by the fact that his friend had been killed and that he too would be killed." *Id.* at 1180. Again, the entire course of conduct was deemed relevant to determining whether the victim was tortured, not merely the defendants' final act in shooting the victim.

More recently, this Court found that the torture aggravator was established in the context of prolonged child abuse that eventually caused the victim's death. Thus, in *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406 (2008), we held that the evidence was sufficient to sustain the torture aggravator where the defendant physically abused his young son for a period of several months before the final incident which ended the child's life. We noted that the defendant "capped a sustained period of abuse by beating a helpless, six-year-old child to death." *Id.* at 417. In *Powell,* as here, there was "an accumulation of abuse that gave rise to complications that resulted in death." *Id.* In considering the sufficiency of the evidence to support the torture aggravator, we looked to the defendant's entire course of conduct towards his six-year-old son, not the conduct limited to the night of the murder itself.

10. Heidnik tortured and murdered two women while holding several others hostage and assaulting them as well. He was sentenced to death for each murder, and in each instance, the jury found the torture aggravator, among other aggravators. As to the second murder victim, the evidence was deemed sufficient to prove torture based upon evidence that Heidnik administered electrical shocks to her body "while she lay in a water-filled pit and screamed in agony." *Id.* at 692–93.

We explained that Powell's "abuse of [the victim] was not limited to the night of the murder; rather, [Powell] isolated and abused [the victim] for a period of several months, subjecting him to prolonged beatings severe enough to be audible to [Powell's] neighbor.... The frequent beatings inflicted severe injuries, both visible and internal, that disfigured the six-year-old's face and irreparably damaged his brain." *Id.* at 426, 956 A.2d 406. We noted that the defendant in *Powell* beat his six-year-old son to death "over the course of at least several hours, or, viewed more broadly, the course of months." *Id.*

We stated in *Pursell* that the torture aggravator is intended to distinguish "those murders of the first degree where the actual commission of the offense included such concurrent acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily painful to the victim." *Pursell,* 495 A.2d at 197. Appellant now urges us to focus solely on the phrase "concurrent acts," and find that the *Pursell* case established that the torturous act, in order to constitute torture for purposes of the statute, must occur immediately before the victim's death. Appellant's interpretation is premised upon an unreasonable constriction of the language in *Pursell,* as well as the plain language of the statute, and gives insufficient consideration to the ensuing cases.

*Pursell* ties its formulation of "concurrent acts" to the time period in which the "actual commission of the offense" occurred. What is truly at issue, then, is how to define the commission of the offense, and not the moment of death alone. In *Pursell,* the offense was begun and completed in a brief period of time, temporally linking the acts of torture with the moment of death in that case. However, as *Powell, Daniels,* and *Heidnik* recognize, murders committed by means of torture are often not so expeditiously carried out. Indeed, some of the more "conscienceless or pitiless" crimes that are most "unnecessarily painful to the victim" are those in which the offense is committed over an extended period of time.

 Appellant poses two questions here: first, whether the history of abuse could be considered at all; and second, whether the evidence was sufficient to sustain the jury finding of the aggravator. On the first question it is clear that the jury may properly consider acts by the defendant that ultimately contributed to the victim's death. Here, the medical evidence established that the abuse appellant inflicted upon P.B. before the night when he carried out the final act directly contributed to her death. The jury considered those acts—appellant's course of conduct—as evidence of appellant's intent to kill. It would be illogical to permit the jury to consider the defendant's course of conduct as part of the murder itself for the purpose of evaluating specific intent, and then prevent the jury from considering the very same course of conduct as part of the "actual commission of the offense" for purposes of the torture aggravator. While torture may often occur contemporaneously with the killing blow or blows, this is not necessarily required—as reflected in our case law as, for example, when the victim is held against his or her will and terrorized for a lengthy period of time. It would defy logic and common sense to interpret the statute so that defendants who inflict pain and suffering over a course of time on their victims are deemed immune from the aggravator.

The evidence here was sufficient to support the jury's finding of the aggravator. The beatings and neglect appellant inflicted upon P.B. took place over the course of months and caused bruises, abrasions, and scars over most of her body. She suffered sudden and serious weight loss, and was underweight from lack of food. The severe physical and emotional abuse caused her to suffer from inanition, making her more susceptible to severe injury resulting from further abuse. The months of torture then culminated on the night of the killing, as appellant beat P.B. with an extension cord in a cold shower, then beat her again later that evening, just before throwing her into the radiator with sufficient force to leave indentations in her face and head. Appellant then threw the three-year-old behind the bed, where she slowly suffocated over the course of hours. Appellant did nothing to assist the

child and prevented others from tending to her while *in extremis*. Indeed, this action alone suggests torture, independent of the prior course of abuse. When abuse such as appellant inflicted here contributes to death, we cannot separate the abuse from the death it caused. From the facts presented at trial, the jury reasonably could conclude that appellant intended to inflict substantial pain and suffering, over and above his intent to, ultimately, kill. Accordingly, no relief is due on this claim of error.

## IV. Trial Court Error In Instructing the Jury on the Torture Aggravator

Appellant next claims that the trial court's jury instruction on the definition of torture was misleading and incomplete, authorizing the jury to believe that it could consider "any pain" appellant inflicted upon P.B. during the course of her stay in the apartment. Appellant argues that this instruction was unconstitutional because it did not limit the jurors' consideration of torturous acts to the time of the murder. Appellant also reiterates his sufficiency argument, asserting that the instruction conflicts with his view of established law limiting the jury's consideration to pain inflicted upon the victim concurrently with the murder.

The Commonwealth responds that appellant failed to object to the instruction, and thus the complaint is waived, and, in any event, his complaint is meritless.

A review of the record reveals that the Commonwealth is correct. Appellant did not object to this instruction. The absence of a contemporaneous objection below constitutes a waiver of appellant's claim respecting the court's charge. Pa.R.A.P. 302(a); *see also Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 733 (2002) (appellate court will not consider claims for the first time on appeal because absence of trial court opinion is impediment to meaningful and effective appellate review). Therefore, this claim is defaulted.

## V. *Caldwell* Violation

■ Appellant finally claims that his death sentence was the product of "prejudice and arbitrariness," in violation of the Sentencing Code's mandatory penalty review provision. *See* 42 Pa.C.S. § 9711(h)(2). Specifically, appellant argues that the penalty must be vacated because trial counsel, during his penalty phase closing, repeatedly made reference to the appeals process, in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (plurality opinion in part). Appellant argues that these references to the appeals process led the jury to believe that it was not the final arbiter of the death penalty, thereby reducing its sense of responsibility.

Specifically, appellant notes that trial counsel stated in his closing that imposition of the death penalty carries a greater financial cost than a life sentence. When discussing his opinion of why the death penalty is costlier, trial counsel stated that, "[y]ou know there's always the damn lawyers and the appeals. That's part of it, too." N.T., 5/25/05, at 144–46. Appellant now asserts that these remarks violated what he says is *Caldwell's* rule barring any comments about the appellate process, a rule this Court has enforced in *Commonwealth v. Jasper,* 558 Pa. 281, 737 A.2d 196 (1999). Appellant also urges this Court to find that these comments engendered precisely the harm identified in *Caldwell* by leading the jury to believe that it was not the final arbiter of the death penalty.

Recognizing that he never objected below and that this claim presumptively falls under the rubric of ineffective assistance of counsel and should be reviewable only on collateral attack, appellant argues that the claim is presently reviewable under this Court's statutory review standard in 42 Pa.C.S. § 9711(h)(1), specifically, our review for arbitrary factors relating to a death sentence. Appellant asserts that counsel's comment injected an arbitrary factor into the proceedings by removing the final sentencing responsibility from the jury. Appellant reasons that, as this Court has a statutory duty to determine whether the death penalty was the product of passion, prejudice, or some other arbitrary factor, this claim

should be deemed immediately reviewable, notwithstanding that it was not raised below.

The Commonwealth replies that appellant's attempt to re-characterize his ineffective assistance claim as a claim of sentencing arbitrariness is meritless and we should deem this claim to be unreviewable on direct appeal pursuant to the rule this Court articulated in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002). The Commonwealth also notes that appellant failed to raise the issue of trial counsel's closing argument in his Pa.R.A.P.1925(b) statement, thus depriving this Court of the views of the trial judge. The Commonwealth asserts that appellant's request for this Court to review the matter on direct appeal is merely a disguised invitation to ignore *Grant's* directive to defer ineffective assistance claims until collateral review. We agree with the Commonwealth that this claim of counsel ineffectiveness is properly reviewable on collateral attack, and that it is not encompassed by our statutory review.

"An action or factor is arbitrary if it is not cabined by law or principle." *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 102 (2004) (citing BLACK'S LAW DICTIONARY 100 (SEVENTH ED. 1999)). Appellant's argument is that his lawyer's argument here so obviously violated *Caldwell v. Mississippi* that it infected the sentencing process with an arbitrary factor. Appellant misapprehends both *Caldwell* and the nature of a claim of ineffective assistance of counsel.

*Caldwell* did not involve a claim of ineffective assistance of counsel: the claim there was a preserved one of trial court error sounding under the Eighth and Fourteenth Amendments. The prosecutor in *Caldwell* urged the jury in his penalty phase summation that it should not view itself as the final arbiter of whether the defendant should die, as the death sentence would be reviewed by the state Supreme Court. That argument was forwarded in response to a defense argument that the defendant's life "rest[ed] in [the jury's] hands," that the jury "can give him life or give him death.... You are the judges and you will have to decide his face. It is an

awesome responsibility, I know-an awesome responsibility."
*Caldwell,* 472 U.S. at 324, 105 S.Ct. 2633.

On direct appeal to the Mississippi Supreme Court, the appellant argued that the prosecutor's comments violated the Eighth Amendment. The Mississippi Supreme Court deadlocked four-four on that question, resulting in affirmance. The U.S. Supreme Court then granted certiorari to determine whether the prosecutor's argument "rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " 472 U.S. at 323, 105 S.Ct. 2633 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)).

The High Court found that the prosecutor's argument ran afoul of the Eighth Amendment, and reversed and remanded the sentence. The Court held that, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–329, 105 S.Ct. 2633.[11] Notably, *Caldwell* did not purport to bar all prosecutorial references to the appeals process. The holding instead was both broader in part and narrower in part, as it disapproved references which lead the sentencing jury to believe that responsibility for a death sentence rests other than with the jury.

Relying on *Caldwell,* this Court determined in *Commonwealth v. Baker,* 511 Pa. 1, 511 A.2d 777 (1986), that remarks by the prosecutor that tend to minimize the jury's sense of

11. Justice Marshall's opinion in *Caldwell* was joined in its entirety by Justices Brennan, Blackmun, and Stevens. Justice O'Connor joined the portion of the opinion cited by appellant, thus, *Caldwell* is a majority opinion for the proposition that a defendant's Eighth Amendment rights are violated when a prosecutor's argument leads the jury to believe that it is not the final arbiter of the death penalty. Justice O'Connor joined the lead opinion with the exception of one narrow point, regarding the lead opinion's characterization of *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). *Caldwell,* 472 U.S. at 341, 105 S.Ct. 2633 (O'Connor, J., concurring in part and concurring in the judgment).

responsibility for imposing a death sentence can constitute reversible error. In *Baker*, the prosecutor informed the jury that, even if it imposed a sentence of death, "[y]ou get appeal after appeal after appeal, if you think the Supreme Court is going to let anybody get executed until they're absolutely sure that that man has a fair trial, make no mistake about that." *Id.* at 782. The defendant's counsel did not object to these comments, which was not surprising since the case was tried in 1984, before *Caldwell* was decided. After deliberations, the jury found two aggravating circumstances and no mitigating circumstances, and returned a sentence of death.

On appeal, the defendant claimed that the prosecutor's comments constituted reversible error under the rule articulated in *Caldwell,* and that his trial counsel was ineffective for failing to object. This Court did not reach the ineffectiveness claim, reasoning that the claim was reviewable under the relaxed waiver rule then in effect in death penalty direct appeals. We then vacated the death sentence, finding that the prosecutor's remarks violated the rule in *Caldwell* by engendering "bias and prejudice" against the defendant. *Id.* at 789–90.

This Court extended the holding of *Baker* to include remarks by the trial court in *Commonwealth v. Jasper*, 558 Pa. 281, 737 A.2d 196 (1999). In *Jasper*, the defendant was convicted of first-degree murder and sentenced to death. On direct appeal, this Court affirmed the finding of guilt, but remanded for a new penalty hearing. Following the second penalty hearing, the jury found one mitigating and two aggravating circumstances and again returned a death verdict. On appeal from the second penalty phase outcome, the defendant claimed that the trial court had erred in instructing the jury that, due to the appeals process, it was not the final arbiter of the sentence. The *Jasper* trial court instructed the jury as follows:

> Now, with regards to the death penalty, you know what that implies. Somewhere down the line, if you impose the death penalty, the case will be reviewed thoroughly. And after thorough review the death penalty may be carried out. I

won't go into all the various reviews that we have. That shouldn't concern you at this point.

*Id.* at 196. The *Jasper* Court found that the *Caldwell/Baker* rule logically extended to remarks made by the trial judge, but cautioned that review of such claims must occur on a case-by-case basis. We explained that, "[w]e are unwilling to prescribe a *per se* rule forbidding mention of the appellate process in death penalty cases, since there may be extraordinary circumstances, such as a response to a defense argument, that necessarily entail mention of the appellate process." *Id.* at 198.

This Court recently applied the *Caldwell/Baker/Jasper* rule in *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220 (2006). In *Carson*, the defendant was convicted of first-degree murder and was sentenced to death. On collateral review, the defendant claimed that trial counsel was ineffective for failing to object to the trial court's penalty-phase jury instructions that, the defendant, argued, led the jury to believe that the ultimate responsibility for determining the appropriateness of the death penalty lay with the Pennsylvania Supreme Court, in violation of the *Caldwell* rule. This Court disagreed, finding that the *Caldwell* rule was not applicable because the challenged instruction was not given in a vacuum, but "resulted from the prosecutor's objection to defense counsel's statement that the jury was not in the prosecutor's execution chamber." *Carson*, 913 A.2d at 279. The full instruction issued by the trial court in sustaining the prosecution's objection informed the jury that "[t]he prosecutor is not an execution chamber. What it is is a place in the State of Pennsylvania ... where lethal injection is given to those who are committed to death by a jury and when that sentence has been imposed by the Judge and as reviewed by the supreme court and the governor." *Id.* This Court reasoned that in evaluating whether a certain statement violated the *Caldwell* rule, the statement must be examined in the context where it was given, and that the *Carson* instruction only served to clarify that the Commonwealth of Pennsylvania, rather than the prosecutor, actually executes persons sentenced to death. We determined

that the trial court, in order to provide a thorough explanation following the defense remark, did not err in explaining the procedures that occur before an execution is carried out, and that mere mention of those procedures did not "shift responsibility away from the jury for giving appellant the death sentence by implying that it was not the ultimate decision-maker, suggest that the jury should not feel gravely responsible for imposing the death penalty, or imply that any death sentence imposed by the jury might not be carried out." *Id.* at 279–80.

 It is apparent that appellant's argument here misapprehends the rule emerging from the *Caldwell/Baker/Jasper* line of cases. First, the comment here did not urge the jury to believe that it was not the final arbiter of life or death; to the contrary, counsel exhorted the jury to return a life verdict (a final, unreviewable verdict even if questionably rendered) to save tax dollars. Second, and contrary to appellant's argument, the *Caldwell* line does not embrace any and all references to the appeals process, nor has it yet been extended to defense commentary. Third, there is no *per se* rule requiring reversal when any mention of the appeals process is made at the sentencing phase of a capital trial. And so, even if we agreed with appellant that certain events at trial, resulting from defense counsel's conduct, which do not lend themselves to timely objection, fall within statutory review if they violate existing, plain constitutional restrictions, this is not such a case.

 Furthermore, since *Grant*, we do not generally view waived issues deriving from obviously strategic decisions (whether good or bad) of a defendant's own trial counsel as being appropriate for initial consideration direct appeal. Even viewed in its best light, appellant's claim of ineffectiveness would require this Court to examine defense counsel's comment in context, determine whether the remark had the effect of "minimiz[ing] the jury's sense of responsibility for the verdict of death," *Jasper*, 737 A.2d at 197, determine if *Caldwell* necessarily applies to defense counsel, determine whether

counsel's remark was pursuant to a reasonable strategy, and assess prejudice. Here, no record was developed below and we are without the benefit of trial counsel's explanation or the trial court's views. This is not the sort of claim that should be raised for the first time on appeal, under the guise of statutory review. Indeed, if that were the case, *Grant* would essentially be rendered inapplicable to penalty phase claims.[12]

Accordingly, the alleged *Caldwell* violation at issue here, arising from defense counsel's penalty phase argument, does not implicate an "arbitrary factor" for the purposes of 42 Pa.C.S. § 9711(h)(3). The waived claim, thus, is unreviewable, and we dismiss the claim without prejudice to appellant's right to pursue it under the PCRA.

## VI. Statutory Review

Having reviewed all of appellant's claims, we conclude that relief is not warranted. Accordingly, pursuant to the Sentencing Code, this Court is required to conduct a statutory review of the death sentence and we must affirm the sentence unless we determine that:

12. The cases appellant string cites, with scant explanation, for the proposition that his ineffectiveness/*Caldwell* claim falls within statutory review for passion, prejudice or other arbitrary factors do not support his position. *See* Brief for Appellant at 39. The vast majority of cases that appellant cites pre-date this Court's decision in *Commonwealth v. Grant, supra*, which generally requires the deferral of ineffective assistance of counsel claims to collateral attack, as well as this Court's abrogation of the capital direct appeal relaxed waiver doctrine in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003). Moreover, none of the cases, including the later cases of *Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 447–48 (2004) and *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52 (2003) (the *Fears* Court in fact applied relaxed waiver because it was briefed before *Freeman* was decided) remotely stands for the proposition that an otherwise-waived claim, sounding in trial counsel ineffectiveness, is available under direct appeal statutory review merely because the appellant claims that trial counsel's conduct injected an arbitrary factor. Indeed, if that were the rule, the *Grant* rule would disappear for penalty phase claims of ineffectiveness. Finally, appellant cites *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75 (2004), but not in support of the proposition that waived claims of trial counsel ineffectiveness are resuscitated via statutory review. In point of fact, the claim in *Boczkowski* was preserved below.

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance. . . .

42 Pa.C.S. § 9711(h)(3).

After careful review, we conclude that the evidence was sufficient to support the two aggravating circumstances found by the jury. Appellant does not dispute, nor could he, that P.B. was under the age of twelve when she was murdered. Further, as discussed above, the evidence was sufficient to sustain the torture aggravator. After careful review of the record, we are satisfied that the jury's sentence of death was not the product of passion, prejudice, or any other apparent arbitrary factor, but was based upon the evidence admitted at trial.

Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[13]

Justice SAYLOR, EAKIN, BAER and McCAFFERY and Justice GREENSPAN join the opinion.

Justice TODD files a concurring opinion.

Justice TODD, concurring.

I join the Majority Opinion, with one exception. In addressing Appellant's claim of a putative *Caldwell*[1] violation, *see* Majority Op. at 257–65, 980 A.2d at 55–59, the Majority broadly concludes that, on direct capital appeal, ineffectiveness of counsel claims may not form the basis for an assertion that a sentence of death "was the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S.A. § 9711(h)(3). I do not agree with the Majority that our statutorily-mandated

---

**13.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

**1.** *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

review under Section 9711(h)(3) may be foreclosed simply because the claim is based in ineffectiveness.

The Majority focuses on our decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), wherein this Court determined that criminal litigants, as a general rule, must wait until collateral review to raise ineffectiveness claims. *Grant* was based on prudential concerns that, in the absence of a developed record, appellate courts were poorly equipped to make the type of assessments that ineffectiveness claims could require. *See Grant*, 572 Pa. at 65–67, 813 A.2d at 737–38; *id.* at 67, 813 A.2d at 738 ("Deferring review of trial counsel ineffectiveness claims until the collateral review stage of the proceedings offers a petitioner the best avenue to effect his Sixth Amendment right to counsel."). Nevertheless, it is evident to me that, regardless of their merit, *Grant's* practical considerations may not override our statutory duties under Section 9711 to assess whether a sentence of death was the product of passion, prejudice, or other arbitrary factor. Absent constitutional impediment, we may not decline that statutory duty.

Furthermore, it is insufficient compliance with that duty, to my mind, that such review may obtain in post-conviction proceedings. Under Section 9711(h), a sentence of death is subject to automatic review by this Court, and that statute obligates this Court to affirm a sentence of death unless, *inter alia*, we determine it is the product of passion, prejudice, or other arbitrary factor—whether or not a litigant raises such a contention. By my reading, execution of that mandate may not be deferred to potential collateral proceedings, and a claim implicating that assessment, based on counsel's ineffectiveness or otherwise, may likewise not be deferred.

I recognize the Majority's practical concern that review under Section 9711(h)(3) could swallow the *Grant* rule for penalty-phase claims, Majority Op. at 224 & n. 12, 980 A.2d at 59 & n. 12, and I would support limitations that did not substantively undermine our statutory obligations. Notwithstanding my position, it is sufficient for disposition of the

present case to observe that Appellant's *Caldwell* claim clearly lacked merit, as the Majority cogently explained. *See* Majority Op. at 260–65, 980 A.2d at 55–59.