J-A26040-19

2020 PA Super 110

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :        PENNSYLVANIA
                                        :
                    v.                  :
                                        :
                                        :
COREY DENT YACHIMOWSKI                   :
                                        :
                    Appellant            :   No. 690 WDA 2019

Appeal from the Judgment of Sentence Entered March 27, 2019
In the Court of Common Pleas of Clarion County Criminal Division at
No(s):  CP-16-CR-0000424-2018

BEFORE:  SHOGAN, J., LAZARUS, J., and OLSON, J.

OPINION BY OLSON, J.:                          **FILED MAY 06, 2020**

Appellant, Corey Dent Yachimowski, appeals from the judgment of sentence entered on March 27, 2019, as made final by the denial of Appellant's post-sentence motion on May 1, 2019. We vacate Appellant's judgment of sentence and remand for a new trial.

The Commonwealth charged Appellant and Samantha Marie Woodside (hereinafter, collectively, "the Defendants") with endangering the welfare of their five-year-old daughter, F.Y.[1] During the Defendants' consolidated jury trial, the following evidence was presented.

The Commonwealth first presented the testimony of Patricia Crawford. Ms. Crawford testified that she is a case manager for Family Psychological Associates and that, in May 2018, both F.Y. and Ms. Woodside were her clients. N.T. Trial, 2/11/19, at 20-21 and 31. Ms. Crawford testified that, at

_____

[1] 18 Pa.C.S.A. § 4304(a)(1).

approximately 10:30 a.m. or 10:45 a.m. on the morning of May 17, 2018, she knocked on the front door of a home shared by the Defendants. *Id.* at 20-21. She testified that, after Appellant opened the door and let her in, she watched Appellant walk back to F.Y.'s bedroom with a portable drill in his hand. *Id.* at 21-22. She observed two baby gates – stacked one on top of the other – blocking F.Y.'s doorway and she watched as Appellant used the drill to unscrew the top baby gate from the two sides of the doorframe to allow F.Y. to leave her room. *Id.* at 22, 26-27, and 36. The baby gates were made of plastic, with a "plastic lattice-work type of stuff in the middle," which could be seen through. *Id.* at 36-37.

Ms. Crawford testified that, when F.Y. walked up to her, F.Y. was chewing on either tissue paper or a paper towel. *Id.* at 22. When Ms. Crawford asked F.Y. why she was chewing on the object, F.Y. "said that she was hungry." *Id.* However, Ms. Crawford testified that, as far as she could tell, F.Y. was not underfed and was not lacking in proper hygiene. *Id.* at 33-34. Further, Ms. Crawford testified that the home was not in disarray. *Id.* at 34.

The Commonwealth next called Clarion County Children and Youth Services ("CYS") caseworker Judy Rawson-Myers as a witness. *Id.* at 40. Ms. Rawson-Myers testified that she received a report that F.Y. was being confined in her room by the use of secured baby gates. *Id.* at 41 and 46. She testified that, in response to the report, on May 17, 2018, she and two Pennsylvania

State Troopers arrived at the Defendants' residence and Ms. Rawson-Myers spoke with the Defendants. *Id.* Ms. Rawson-Myers testified:

> I explained to [the Defendants] why I was there. . . . They kept looking at each other. They really weren't talking. I asked to see [F.Y.'s] bedroom. I walked back [through] the hall. There was still a baby gate in the hall and about . . . four-and-a-half feet up the wall along the wooden door frame, there was still a screw that was screwed into the right side of the door frame. . . .
>
> Inside of [F.Y.'s] bedroom . . . , there was a potty chair sitting on the floor with a box of wipes and a bed.

*Id.* at 42-43.

Ms. Rawson-Myers testified that she asked the Defendants why they were using the baby gates to block F.Y.'s doorway. *Id.* at 44. The Defendants "both said that they were doing that to keep [F.Y.] in the room, so [F.Y.] didn't get into things whenever they hadn't gotten out of bed in the morning." *Id.* at 44.

Following Ms. Rawson-Myers' testimony, the Commonwealth rested and Ms. Woodside testified on her own behalf. *Id.* at 58. Ms. Woodside testified that she and Appellant installed the baby gates in the doorway to F.Y.'s room because F.Y. "likes to get up at two or three in the morning and play" while she and Appellant were asleep. *Id.* at 61. She testified that F.Y.'s play involved anything from going "to the living room [to] play with her toys" to "climb[ing] on [a] chair to get the stuff off the top of the fridge" to playing with the family's "three cats and two dogs." *Id.* at 61 and 63. Ms. Woodside

testified that, to prevent F.Y.'s nightly wanderings while she and Appellant were asleep, they "put baby gates up." *Id.* at 67.

As Ms. Woodside testified, they initially started with one gate, which they screwed into the doorframe. *Id.* However, F.Y. "found a way to constantly climb over the gate" and the Defendants, therefore, "put a second [gate] on top." *Id.* at 67 and 70. Ms. Woodside testified that the upper gate was never screwed into the doorframe. *Id.* at 70.

Ms. Woodside testified that, in May 2018, she was recovering from a hysterectomy and had been told to "take it easy" and to get lots of bedrest. *Id.* at 60. She testified that, when Ms. Crawford arrived at their house on the morning of May 17, 2018, Appellant woke her up and went to get F.Y. Ms. Woodside testified that she did not see Appellant use a drill to retrieve F.Y. from the room, but she acknowledged that Appellant "could have" done so. *Id.* at 76 and 101. According to Ms. Woodside, Ms. Crawford stayed for approximately 15 minutes and then left. *Id.* at 86-87.

According to Ms. Woodside, later in the day, Ms. Rawson-Myers and two Pennsylvania State Troopers arrived at their house. *Id.* at 87. During the visit, Ms. Rawson-Myers spoke to the Defendants in a "raised" voice and told them that they could not have the gates blocking F.Y.'s doorway, as it "was a safety issue in case of fire." *Id.* at 89. Ms. Woodside testified that she and Appellant "didn't think of that when [they] put the gates up . . . [w]e were only doing it for [F.Y.'s] safety." *Id.* at 89. However, after being told of the dangers, Ms. Woodside testified that Appellant took the gates down and put

them in their shed. *Id.* at 91. She testified that they have never used the gates again. *Id.* Further, Ms. Woodside reiterated that they employed the baby gates for one reason: F.Y.'s safety. *Id.* at 112-113.

Following Ms. Woodside's testimony, the trial court permitted the Commonwealth to reopen its case to present additional evidence. Of note, Pennsylvania State Trooper John Dubovi testified that, during the lunch recess, he obtained and served a warrant to search the Defendants' shed. Trooper Dubovi testified that he found three baby gates in the shed and that he observed "at least two drill holes [in] each of the gates," which were not made by the manufacturer. *Id.* at 136.

At the close of the Defendants' case, the Defendants' attorney requested that the trial court provide the jury with a parental justification instruction, pursuant to Pennsylvania Suggested Standard Criminal Jury Instruction 9.509(a). *See* N.T. Trial, 2/11/19, at 123. Instruction 9.509(a) is based upon 18 Pa.C.S.A. § 509(1), which reads:

> The use of force upon or toward the person of another is justifiable if:
>
> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:
>
> > (i) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct; and
> >
> > (ii) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily

injury, disfigurement, extreme pain or mental distress or gross degradation.

18 Pa.C.S.A. § 509(1).

The trial court denied the requested instruction, reasoning:

Well, [Section 509(1)] reads, "the use of force upon or toward the person of another is justifiable if. . . ."

So I think that the issue is whether this putting up the gate . . . was the use of force upon or toward the child.

Another consideration is with regard to the standard charge 9.509(a). The subcommittee note begins [by] saying Section [509] of the Crimes Code sets forth special rules that apply when the defendant is charged with using force upon a person for whose care the defendant has special responsibility. In this case, neither defendant is charged with using force. It is not an element of endangering the welfare. And I am interpreting the statute with help from the subcommittee. Primarily, . . . the defendants did not use force upon or toward the child, so I am going to deny the request for the charge at 9.509(a).

N.T. Trial, 2/11/19, at 126.

The jury found both Defendants guilty of endangering the welfare of a child. *Id.* at 126 and 183. On March 27, 2019, the trial court sentenced Appellant to serve a term of nine months to two-years-less-one-day in the Clarion County Jail and Ms. Woodside to serve a term of three years of probation for their convictions. N.T. Sentencing, 3/27/19, at 10-11. Following the denial of the Defendants' post-sentence motion, the Defendants filed timely notices of appeal. Appellant raises one claim on appeal:

Did the trial court err in failing to provide a justification defense instruction where [the Defendants] were individuals with special responsibility to the victim and [the Defendants']

- 6 -

use of force, in the form of confinement, was used for purposes of the victim's protection?

Appellant's Brief at 4.

Appellant claims that the trial court erred when it refused to instruct the jury on the affirmative defense of parental justification. *Id.* at 9; *see also* *Commonwealth v. Capitolo*, 498 A.2d 806, 809 (Pa. 1985) (holding that justification defenses are affirmative defenses). As our Supreme Court has explained:

> When a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict. Instructions on defenses or theories of prosecution are warranted when there is evidence to support such instructions. In examining jury instructions, our [standard] of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error.

*Commonwealth v. Chambers*, 980 A.2d 35, 49-50 (Pa. 2009) (quotations and citations omitted); *see also Commonwealth v. Borgella*, 611 A.2d 699, 700 (Pa. 1992) ("[a] defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor") (quotations and citations omitted).

Appellant's claim requires that this Court interpret 18 Pa.C.S.A. § 509. In matters of statutory interpretation, "our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Parsons*, 166 A.3d

1242, 1246 (Pa. Super. 2017). We have explained that, in interpreting a statute:

> We are constrained by the rules of statutory interpretation, particularly as found in the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501–1991. The goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly. Our Supreme Court has stated that the plain language of a statute is in general the best indication of the legislative intent that gave rise to the statute. When the language is clear, explicit, and free from any ambiguity, we discern intent from the language alone, and not from the arguments based on legislative history or "spirit" of the statute. We must construe words and phrases in the statute according to their common and approved usage. We also must construe a statute in such a way as to give effect to all its provisions, if possible, thereby avoiding the need to label any provision as mere surplusage.

*C.B. v. J.B.*, 65 A.3d 946, 951 (Pa. Super. 2013) (citations, corrections, and some quotations omitted).

The Defendants requested that the trial court instruct the jury on the parental justification defense, pursuant to Pennsylvania Suggested Standard Criminal Jury Instruction 9.509(a). *See* N.T. Trial, 2/11/19, at 123. As noted above, Instruction 9.509(a) is based upon 18 Pa.C.S.A. § 509(1), which reads:

> The use of force upon or toward the person of another is justifiable if:
>
> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:

> (i) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct; and
>
> (ii) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation.

18 Pa.C.S.A. § 509(1).[2]

The trial court denied the requested jury instruction, reasoning that the statutory defense of parental justification only applies to the use of "force." N.T. Trial, 2/11/19, at 126. According to the trial court, the Defendants' actions constituted "confinement" and confinement was not "force." As such, the trial court held, the statutory defense did not apply to the Defendants' conduct and the Defendants were not entitled to the requested instruction.[3] **Id.** Appellant now claims that the denial of the requested instruction constituted prejudicial error. We agree with Appellant.

The parental justification defense found in Section 509(1) attempts to balance competing interests. **Commonwealth v. Ogin**, 540 A.2d 549, 554 (Pa. Super. 1988). On the one hand, Section 509(1) furthers the "primary role of parents in preparing children to assume the obligations and

---

[2] 18 Pa.C.S.A. § 509(1) is based upon Section 3.08(1) of the Model Penal Code.

[3] The trial court also denied the requested instruction because the crime of endangering the welfare of a child does not have an explicit statutory element that requires force. **See** N.T. Trial, 2/11/19, at 126; **see also** Trial Court Opinion, 4/30/19, at 6. However, this reasoning immediately fails, as Section 509(1) has no such requirement.

responsibilities of adults" and society's "need to ensure that the state through its criminal justice system does not unduly interfere with the private realm of family life." *Id.* However, balanced against those interests is the state's "powerful interest in preventing and deterring the battering of children." *Id.* Where applicable, the parental justification defense "defines conduct [that is] otherwise criminal, [but] which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure." Wayne R. LaFave, 2 SUBSTANTIVE CRIMINAL LAW § 9.1(a)(3) (3d ed.) (quotations and citations omitted).

The parental justification defense has the following statutory elements: 1) the actor uses "force upon or toward the person of another;" 2) the actor "is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person;" 3) "the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct;" and, 4) "the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." 18 Pa.C.S.A. § 509(1).

It is undisputed that the Defendants are the parents of F.Y. and that F.Y. is a minor. Further, there is sufficient evidence for a reasonable jury to find that the Defendants acted "for the purpose of safeguarding or promoting the welfare of the minor" and that their actions were "not designed to cause

or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." To be sure, Ms. Woodside testified that she and Appellant utilized the baby gates for F.Y.'s safety, as F.Y. continuously wandered around at night and they were afraid F.Y. would injure herself during these nighttime excursions. Second, Ms. Woodside testified that she and Appellant did not think of the dangers to which F.Y. was exposed in the event of fire. Finally, the Defendants' actions were not so far-afield that it must be said, as a matter of law, that their actions were "designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation."[4] Therefore, the only question in this case is whether the Defendants' actions constituted the "use of force upon or toward" F.Y. We conclude that the Defendants satisfied this element and that they were, thus, entitled to a parental justification defense jury instruction.

The Crimes Code does not specifically define the term "force." **See** 18 Pa.C.S.A. § 501. Nevertheless, as our Supreme Court has noted:

> Webster's New Collegiate Dictionary defines "force" not only as "strength or energy exerted or brought to bear; to do violence," but also to "compel by physical, moral or intellectual means," and "violence, compulsion or constraint exerted upon or against a person or thing." Synonyms offered are "compel, coerce, constrain, oblige," which synonyms have the: "shared meaning element: to make

---

[4] In our view, whether the Defendants' actions were "designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation" are questions properly reserved for resolution by the jury.

someone or something yield. Force, the general term, implies an overcoming of resistance by the exertion of strength, weight, power, stress, or duress."

***Commonwealth v. Rhodes***, 510 A.2d 1217, 1225 (Pa. 1986).

The Defendants' actions, in and of themselves, did not constitute the "use of force **upon**" F.Y. By simply having F.Y. go to her room and then installing the baby gates, the Defendants did not use or apply force directly upon F.Y.'s person. Nevertheless, we conclude that, under the plain language of the statute, the Defendants' actions could constitute the "use of force . . . **toward**" F.Y. Certainly, the evidence demonstrates that the Defendants either screwed-in or otherwise installed the baby gates in F.Y.'s doorway in order to create a physical barricade that prevented F.Y. from leaving her room. Although, left alone, the baby gates constituted a passive force that physically prevented F.Y. from leaving her room, the baby gates were, nevertheless, **a force that was directed towards F.Y.** – the secured gates acted as a physical barrier that prevented F.Y. from leaving her room. Further, although there is no evidence that F.Y. attempted to shake, push through, or otherwise interact with the baby gates to leave the room, we note that, if F.Y. did attempt to break through the barrier, the Defendants' actions would constitute the use of force **upon** F.Y. – just as much as if the Defendants were to physically place themselves behind F.Y.'s doorway to prevent her from exiting her bedroom. Therefore, we conclude that, under the plain language of the statute, a reasonable jury could find that the Defendants' actions constituted

- 12 -

the use of force toward F.Y.  Respectfully, the trial court's contrary conclusion effectively rendered the words "or toward" in § 509(1) surplusage.

Our conclusion is further bolstered by the legislature's use of the word "force" in Chapter Five of the Crimes Code.   Chapter Five of the Crimes Code concerns justification defenses.  **See** 18 Pa.C.S.A. §§ 501-510.  Again, the Crimes Code does not specifically define the term "force."  However, Section 501 defines the term "unlawful force" in the following manner:

> **"Unlawful force."**  Force, **including confinement**, which is employed without the consent of the person against whom it is directed and the employment of which constitutes an offense or actionable tort or would constitute such offense or tort except for a defense (such as the absence of intent, negligence, or mental capacity; duress; youth; or diplomatic status) not amounting to a privilege to use the force.  Assent constitutes consent, within the meaning of this section, whether or not it otherwise is legally effective, except assent to the infliction of death or serious bodily injury.

18 Pa.C.S.A. § 501 (emphasis added).[5]

For our purposes, it is noteworthy that the legislature defined "unlawful force" as "force, including confinement."   This is because the adjective "unlawful" does not change the fundamental nature of the term "force" – which, our legislature has declared, "includ[es] confinement."   Viewed in this manner, we conclude that the definition of the term "unlawful force" as "force,

---

[5] The definition of "unlawful force" in Section 501 derives from Section 3.11 of the Model Penal Code.

including confinement," is evidence that the legislature intended to include "confinement" in the definition of "force."

Further evidence of the legislature's intent to include "confinement" in the definition of "force" is found throughout Chapter Five of the Crimes Code. Specifically, in 18 Pa.C.S.A. § 505 (use of force in self-protection), 18 Pa.C.S.A. § 507 (use of force for the protection of property), and 18 Pa.C.S.A. § 508 (use of force in law enforcement), the legislature included a subsection titled "use of confinement as protective force."[6]  Section 505(c) reads:[7]

> **(c) Use of confinement as protective force.--**The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can, unless the person confined has been arrested on a charge of crime.

18 Pa.C.S.A. § 505(c).

As is true with the definition of "unlawful force," the subsections dealing with "use of confinement as protective force" are evidence that the legislature intended "confinement" to constitute "force."  To be sure, the subsections expressly declare that confinement is a type of force.

---

[6] Sections 505, 507, and 508 of the Crimes Code derive from Sections 3.04, 3.06, and 3.07, respectively, of the Model Penal Code.

[7] As is relevant to this appeal, the three subsections dealing with "use of confinement as protective force" are fundamentally identical.  Therefore, we have only quoted one of the three subsections.

We observe that Section 509 has no separate subsection dealing with "use of confinement as protective force." However, this does not indicate that the term "force," in Section 509, excludes confinement. As we have explained above, Section 509 refers to "force upon or toward," thus implying a concept of force that is either presently applied **or** presently deployed for future or conditional application. Moreover, as Appellant cogently notes, the justification sections that include a subsection on "use of confinement as protective force" involve emergencies and include the subsection **to expressly limit the duration of any confinement to the emergency**. *See* Appellant's Brief at 13; 18 Pa.C.S.A. § 505(c) ("The justification afforded by this section extends to the use of confinement as protective force **only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can**") (emphasis added). The parental justification defense, however, is based upon the special responsibility of the parent to the child. Thus, it would simply not make sense for a similar subsection to exist in the context of the parental justification defense, as the parental justification defense is not limited to the context of an emergency – and, as such, any confinement provision could not be so expressly limited in duration.

Therefore, we conclude that, under the plain language of Section 509(1), the Defendants' actions in confining F.Y. to her room through the use of secured baby gates could constitute the "use of force . . . toward" F.Y. Our conclusion is supported by the manner in which the legislature uses the term

"force" throughout Chapter Five of the Crimes Code. As such, we conclude that the trial court erred when it refused the Defendants' requested parental justification jury instruction. Moreover, we conclude that the failure to instruct the jury on this total defense clearly prejudiced the Defendants. We thus vacate Appellant's judgment of sentence and remand for a new trial.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/6/2020