J-S38013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEFFREY MICHAEL MOYER | : | |
| | : | |
| Appellant | : | No. 204 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 15, 2020,
in the Court of Common Pleas of Lebanon County,
Criminal Division at No(s): CP-38-CR-0001274-2018.

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:       **FILED DECEMBER 01, 2020**

In this matter, Jeffrey Michael Moyer appeals from the judgment of sentence imposed after a jury convicted him of strangulation[1], endangering the welfare of a child[2], and simple assault[3]. Moyer argues each conviction lacked sufficient evidence, or in the alternative, that his actions were legally justifiable, because they constituted parental discipline under 18 Pa.C.S.A. § 509(1). After review, we affirm.

The three convictions stem from a singular incident, which occurred on the evening of July 31, 2018. According to Moyer, he and his eight-year-old

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2718(a)(1)
[2] 18 Pa.C.S.A. § 4304(a)(1)
[3] 18 Pa.C.S.A. § 2701(a)(1)

son, B.M., were watching television with Moyer's paramour[4], Rebecca (B.M.'s stepmother), B.M.'s step-sister J.H., and his half-siblings C. and K. Moyer claimed B.M. misbehaved by holding a plastic baseball bat between his legs to imitate his genitalia, and then repeatedly poked his step-sister in the buttocks with the bat, despite her repeated demands that he stop. *See* N.T., 8/27/19, at 101. According to Moyer, because B.M. had previously acted out in a sexual manner, on this night Moyer decided to impose physical discipline. *Id.* at 95-97; *see also* Exhibits 6-7.

Moyer testified that he physically moved B.M. to another part of the sectional couch, grabbed hold of B.M.'s chin and jaw to raise the child's face to make eye contact, and then asked how many times he must be asked to stop doing something before he complied. *Id.* at 101-103. B.M. talked back, saying it would take "a lot" of times. *Id.* at 103. Moyer then carried B.M. by the arm and leg over the baby gate and out of the room. Moyer testified that he gave his son a light kick on his buttocks with the side of his foot and sent B.M. to his room. *Id.* at 105-106. Rebecca's testimony about the altercation corresponded with Moyer's. Later that evening, B.M. returned to the custody of his mother, Kelly Cole, as part of the normal custody exchange. This was not the version of events the jury believed.

---

[4] On a tangential note, we observe an ambiguity within the record. The transcript lists Rebecca's last name as "Boyer," while Moyer's Brief refers to Rebecca as his spouse. Moyer and Rebecca have two children together, C. and K.

According to other testimony, when Moyer dropped B.M. off at Ms. Cole's home, Ms. Cole immediately noticed a red mark on B.M.'s neck and questioned Moyer. Moyer told her he had "gripped him up." *Id.* at 36. After Moyer left, Ms. Cole took B.M. into her kitchen to show her husband. She took pictures of B.M.'s injury and asked the child what transpired. *See* Exhibit 1A-H.

B.M. told her that Moyer grabbed him by his neck – first by one hand, then by two – and moved him to the other end of the couch. He also told her that Moyer threw him over the baby gate and kicked him in the head and neck, and that he also hit his head off of a door. *Id.* at 39. B.M. told Ms. Cole that he could not breathe while Moyer had his hands around B.M.'s throat. B.M. also said that he tried to answer Moyer's questions ("Do you listen?") during the incident, but he could not physically respond because he could not breathe. *Id.* at 39-40. Ms. Cole called the authorities that same night, and Pennsylvania State Police Trooper Manuel Cabrera responded.

Trooper Cabrera immediately saw the injuries to B.M.'s neck and jaw. *Id.* at 72. Trooper Cabrera testified that B.M. said Moyer grabbed him by the throat, and lifted him off the ground until he could not breathe. *Id.* at 73. B.M. said he could not breathe for about 15 seconds. *Id.* After meeting with B.M. and Ms. Cole, Trooper Cabrera went to Moyer's residence to interview him. Moyer told Trooper Cabrera that he disciplined B.M., but denied that he injured B.M. Moyer also told Trooper Cabrera that B.M. frequently makes things up.

Trooper Cabrera also spoke with Rebecca. Trooper Cabrera testified that, although Rebecca said that she was *not* present during the incident, she claimed B.M. was lying. *Id.* at 84. This testimony comported with B.M.'s testimony, who also testified Rebecca was not present during the incident.

The next day Trooper Cabrera met with B.M. and Ms. Cole at the police station, where he noticed that the bruising appeared more pronounced. *Id.* at 74. Trooper Cabrera also observed that on the left side of B.M.'s face there were pinpoint marks, red marks along his cheek area that were consistent with broken blood vessels. He took more photographs, which depicted how the injury presented over the course of 24 hours. *See* Exhibit 2. Ms. Cole also took B.M. to the emergency room the day after the incident occurred. B.M. was seen by physician's assistant Linda Wenger, who did not recommend further treatment.

Moyer was charged with strangulation, endangering the welfare of a child, and simple assault. Following a jury trial on August 27, 2019, Moyer was convicted of all three offenses. On January 15, 2020, the court sentenced Moyer to an aggregate term of incarceration of 12 months to 5 years. Moyer timely appealed and presents three issues for our review:

> 1. Whether there was sufficient evidence presented at trial to enable the fact-finder to find each element necessary for conviction for the charge of Strangulation under 18 Pa.C.S.A. § 2718(a)(1) since the evidence presented at trial was insufficient to establish that the appellant knowingly or intentionally impeded the breathing or circulation of the blood of the alleged victim by applying pressure to the throat or neck, as required to sustain conviction of the

offense, where the offense occurred within the boundaries of parental discipline of appellant's child?

2. Whether there was sufficient evidence presented at trial to enable the fact-finder to find each element necessary for conviction for the charge of Endangering the Welfare of a Child under 18 Pa.C.S.A. § [4304](a)(1) since the evidence presented at trial was insufficient to establish that the appellant knowingly endangered the welfare of a child by violating a duty of care, protection, or support as required to sustain a conviction of the offense, where the offense occurred within the boundaries of parental discipline of appellant's child?

3. Whether there was sufficient evidence presented at trial to enable the fact-finder to find each element necessary for conviction for the charge of Simple Assault under 18 Pa.C.S.A. § 2701(a)(1) since the evidence presented at trial was insufficient to establish that the appellant attempted to cause, or intentionally, knowingly, or recklessly caused bodily injury to another as required to sustain a conviction of the offense, where the offense occurred within the boundaries of parental discipline of appellant's child?

Moyer's Brief at 4-5.

Moyer's three appellate issues correspond to each of his convictions. For all the issues, Moyer presents a hybrid argument. In essence, Moyer contends first that the evidence was insufficient to prove that he committed the respective offense. Alternatively, he claims even if his conduct was otherwise criminal, he is entitled to the parental justification defense to escape criminal liability, pursuant to 18 Pa.C.S.A.§ 509(1). **See** Moyer's Brief at 12-27. "Where applicable, the parental justification defense 'defines **conduct that is otherwise criminal**, but which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure.'"

- 5 -

*Commonwealth v. Yachimowski*, 232 A.3d 861, 866 (Pa. Super. 2020) (citing Wayne R. LaFave, 2 SUBSTANTIVE CRIMINAL LAW § 9.1(a)(3) (3d ed.) (further quotations and citations omitted) (emphasis added).

I.

For ease of disposition, we first determine whether the Commonwealth presented sufficient evidence to convict Moyer for each of his three offenses.

In reviewing sufficiency challenges, we have said:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted). Importantly, "the jury,

which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." ***Commonwealth v. Ramtahal***, 613 Pa. 316, 33 A.3d 602, 607 (2011).

We begin with Moyer's first conviction, strangulation. The offense of strangulation is defined as follows:

> **(a)  Offense defined**.--A person commits the offense of strangulation if the person knowingly or intentionally impedes the breathing or circulation of the blood of another person by:
>
> (1) applying pressure to the throat or neck

18 Pa.C.S.A. § 2718(a).

Moreover, "[i]nfliction of a physical injury to a victim shall not be an element of the offense. The lack of physical injury to a victim shall not be a defense in a prosecution under this section." 18 Pa.C.S.A. § 2718(b). Still, a person is not guilty of this offense unless he acted intentionally or knowingly with respect to each material element of the offense. ***See*** 18 Pa.C.S.A. § 302 (minimum requirements of culpability).

Section 302(b) provides:

> (1)  A person acts intentionally with respect to a material element of an offense when:
>
> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
>
> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2)    A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b)

Moyer argues:

If [B.M.'s] breathing was in fact impeded within [the] meaning of the statute, the degree of impediment was still minimal. Against that backdrop, it cannot be said that the occurrence of such a minimal impediment, alone, evidences Moyer's conscious object to cause that effect or his appreciation that such an effect was certain to happen.

Moyer's Brief at 19. Moyer reasons that there were "no additional factors, like concomitant statements, which prove intentional or knowing conduct designed to impede the child's breathing." *Id.*

Moyer premises his argument on his trial testimony that he merely took B.M.'s jaw, and held it up so he could look B.M. in the eye. *See id.* at 16. Moyer argues further that B.M. "did not sustain any injuries consistent with suffering forceful punishment from his father." *Id.* However, the record belies Moyer's depiction of events.

Here, B.M. testified that Moyer strangled him by grabbing his throat with both hands with such force that he could not breathe. B.M. tried to answer Moyer's questions ("Do you listen?") but was physically unable to respond.

*See* N.T. at 19-20. Afterward, B.M.'s mother, Ms. Cole, immediately observed – and photographed – the physical manifestations of Moyer's force. So did Trooper Cabrera, who noted that the bruising was even more pronounced the following day, and that on the left side of B.M.'s face, there were pinpoint red marks that were consistent with broken blood vessels. Exhibits 1A-H and 2 bear this out. B.M. said his throat felt like it had holes in it, and that it caused him physical pain for weeks. *Id.* at 22.

In fact, the jury explicitly found Moyer caused bodily injury, even though such a finding was not necessary to convict Moyer. *See* 18 Pa.C.S.A. § 2718(b), *supra*. In rendering these findings, the jury was free to believe all, part, or not of the witnesses' testimony. *See Ramtahal*, *supra.* On appeal, we view this evidence and testimony in a light most favorable to the Commonwealth. *See Franklin, supra.* Thus, for us to agree with Moyer, we would have to substitute our judgment for that of the jury's – a direct circumvention of our well-established principles. *See Franklin*, *supra.*

With this factual finding in mind, we cannot accept Moyer's characterization that the impediment to B.M.'s breathing was minimal. B.M. suffered a physical injury that lasted for weeks. Critically, "a minimal impediment" to one's breathing is still an impediment. Likewise, we disagree with Moyer's argument that a conviction requires "additional factors, like concomitant statements." Moyer cites no legal authority for this argument, and nothing in the statute, or our relevant case law, stands for such a proposition. Nonetheless, Moyer made concomitant statements during the

act. After B.M. sarcastically retorted that he would need to be told multiple times to stop hitting his sister, Moyer grabbed B.M. with both hands around his throat and asked, "Do you listen?" B.M. attempted to respond but was physically unable. Moyer acknowledged to Ms. Cole that he "gripped him up." As such, the jury was entitled to infer Moyer was aware that the pressure he applied to B.M.'s throat impeded his breathing. We conclude there was sufficient evidence to support the strangulation conviction.

Next, Moyer argues there was insufficient evidence that he knowingly endangered the welfare of the child. **See** Moyer's Brief at 20. Our sufficiency analysis for this offense begins with the statutory definition:

> (1)    A parent…supervising the welfare of a child under 18 years of age…commits an offense if he **knowingly** endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1) (emphasis added).

Moyer narrows his challenge to the knowledge element. Here, too, Section 302(b)(2) provides guidance. As applied to this offense, our Court has explained that "the accused must be 'aware that the child is in circumstances that could threaten the child's physical or psychological welfare[.]'" **See Commonwealth v. Smith**, 956 A.2d 1029, 1038 (Pa. Super. 2008) (*en banc*) (further citation omitted). In other words, the "knowing" element of the crime applies to whether the defendant generally knew that he was endangering the child's welfare, not whether the defendant knew that his actions would cause any particular result. **Id.**

On this point, Moyer argues the Commonwealth failed to establish that he knew disciplining of his son would have the opposite effect and endanger the child's welfare. In making such an argument, Moyer conflates sufficiency of the evidence with the parental justification defense. We address the parental justification defense in detail below, but it is worth reiterating here that such a defense recognizes that the conduct in question is otherwise criminal. **See Yachimowski**, **supra**.

As Moyer rightly acknowledges, we employ a "common sense of the community approach" to interpret this element of the statute:

> [W]e find an implicit recognition that parents at times can make mistakes in judgment and that their children may be harmed as a result. However, for such mistakes to rise to the level of criminal culpability, parents must knowingly allow their children to be at risk with awareness of the potential consequences of their actions or of their failure to act.

**Commonwealth v. Miller**, 600 A.2d 988, 992 (Pa. Super. 1992); **see also** Moyer's Brief at 21.

In **Smith** we reasoned, "[i]t takes nothing more than common sense for an adult, let alone an experienced father such as [the appellant], to know that violently shaking an infant child with enough force to cause an abusive head trauma could threaten the child's physical and/or psychological welfare." **Smith** 956 A.2d at 1038-1039 (footnote omitted).

In the case at bar, Moyer squeezed B.M.'s throat with such force that he left nail marks on the child's neck and caused broken blood vessels on the child's face. Moyer also kicked the child in the head and neck. Afterward,

B.M. became so fearful of Moyer that he told his mother he thought he would die if he went back to Moyer's home.  **See** N.T., 8/27/19, at 46.  Like in **Smith**, we observe "it takes nothing more than common sense" for Moyer to know that his conduct could threaten the child's physical and/or psychological welfare.  We conclude that the jury could find Moyer's actions to be beyond the "common sense of the community," thereby satisfying the knowledge element.  Thus, we conclude there was sufficient evidence for the jury to convict Moyer of endangering the welfare of the child.

Finally, Moyer contests the sufficiency of evidence for his simple assault conviction.  That offense is defined as follows:

> **(a)** **Offense defined.—**[…] a person is guilty of assault if he:
>
> (1)   attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]

18 Pa.C.S.A. § 2701(a)(1).

We initially observe that the jury found that bodily injury was actually caused.  Inexplicably, Moyer only contends that "[n]o evidence was introduced to show that…that in fact bodily injury resulted." **See** Moyer's Brief at 25.  We need not rehash the various evidence and testimony supporting the jury's findings, nor the well-established body of law that forbids us from substituting our judgment for that of the jury's.  It suffices to say there was sufficient evidence to support this conviction as well.

II.

Having concluded sufficient evidence supports all three of Moyer's convictions, we turn now to the most fervent aspect of Moyer's appeal – whether the parental justification defense renders Moyer's actions statutorily excusable.

As Moyer correctly notes, Pennsylvania has long acknowledged that parents have a privilege to subject their children to corporal punishment when the children misbehave. *See Commonwealth v. Ogin*, 540 A.2d 549, 554 (Pa. Super. 1988). Our Legislature codified this privilege as a parental justification defense at 18 Pa.C.S.A. § 509(1). Recently, this Court reiterated the purpose of this statute.

> The parental justification defense found in Section 509(1) attempts to balance competing interests. *Commonwealth v. Ogin*, 540 A.2d 549, 554 (Pa. Super. 1988). On the one hand, Section 509(1) furthers the "primary role of parents in preparing children to assume the obligations and responsibilities of adults" and society's "need to ensure that the state through its criminal justice system does not unduly interfere with the private realm of family life." *Id.* However, balanced against those interests is the state's "powerful interest in preventing and deterring the battering of children." *Id.*

*Yachimowski*, 232 A.3d at 866.

Section 509(1) provides:

The use of force upon or toward the person of another is justifiable if:

(1)　The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:

- 13 -

> (i)     the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct; and
>
> (ii)     ***the force used is not designed to cause or known to create a substantial risk of causing death***, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation.

18 Pa.C.S.A. § 509(1) (emphasis added).

The parental justification defense is a three-prong inquiry, which probes (1) the legal relationship of the actors, (2) the purpose of the force, and (3) the degree and nature of the force used. Here, it is self-evident Moyer satisfies the first two prongs of this analysis: Moyer, as a parent of the minor B.M., is a legally qualified actor; and no one disputes that the force Moyer used was for the punishment of B.M.'s misconduct, nor that B.M.'s misbehavior had been an ongoing issue. Only the third prong is in question. Thus, whether Moyer's force was justifiable depends upon the nature and degree of that force.

Moyer cites three cases where the force used was deemed unjustifiable and attempts to distinguish them from his case. In ***Ogin***, ***supra***, this Court concluded that appellant's discipline was not justifiable, after a 17-month old baby was "flung…like a rag doll" against an outside wall of an apartment building, backhanded in the face, and had a plate of hot food shoved in her face when she would not eat her dinner. ***See Ogin***, 540 A.2d at 551. In ***Commonwealth v. Douglass***, 588 A.2d 52, 55-56 (Pa. Super. 1991), this Court similarly ruled that a teacher was not justified in his use of corporal

- 14 -

punishment after paddling a first-grader between 50 and 60 times. In *Commonwealth v. Tullius*, 582 A.2d 1, 2 (Pa. Super. 1990) a teacher shoved a backtalking sixth-grader against a locker, causing the child to have bruises on his arms, ear, back and neck; we concluded the discipline was not justified.[5]

Here, Moyer contends "[B.M.] did not sustain any injuries consistent with suffering forceful punishment from his father," and the "only injuries sustained were faint bruising and minor scratches[.]" *See* Moyer's Brief at 16. Moyer concludes that the evidence lacks any showing of extreme pain, mental distress or gross degradation. *See id.* at 25. In other words, Moyer's only argument is he inflicted a minimal degree of force. This argument presumes that he did not actually injure B.M., despite the jury's finding to the contrary – a finding firmly supported by the record, and thus a finding we must view in a light most favorable to the Commonwealth.

Significantly, the analysis does not hinge on the degree of force used. Section 509(1)(ii) examines whether the force used is either "*designed to cause* or *known to create* a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." 18 Pa.C.S.A. § 509(1)(ii) (emphasis added). Therefore, we examine the

_____

[5] Although *Douglass* and *Tullius* implicate Section 509(2) because the actors were teachers, these cases are still relevant to our analysis of the third prong. The criteria to determine whether the degree of force was justifiable is the same for teachers as it is for parents. *See* 18 Pa.C.S.A. § 509(2)(ii) ("the degree of force, if it had been used by the parent…would not be unjustifiable under paragraph (1)(ii)").

nature of Moyer's force – that is, strangulation – to determine whether such force was designed to cause, or known to create, *inter alia*, a substantial risk of death.

In our review, we are faced with a dearth of case law pertaining to both strangulation under 18 Pa.C.S.A. § 2718(a)(1), as well as the parental justification defense's "substantial risk of death" provision under 18 Pa.C.S.A. § 509.[6] But we are not without guidance.

Unlawful corporal discipline is a form of domestic violence. ***See, e.g.,*** The Protection From Abuse Act, 23 Pa.C.S.A. § 6102(a).[7] While domestic violence generally refers to violence between family members, it is most often understood as violence between paramours. Within this realm, strangulation is "known unequivocally" as one of the most lethal forms of domestic violence, and it is "one of the best predictors for subsequent homicide of victims of domestic violence." G. Strack & C. Gwinn, ***On the Edge of Homicide: Strangulation as a Prelude***, 26 FALL CRIM JUST 32, 33-34 (2011).[8]

---

[6] Although this Court recently decided ***Yachimowski***, ***supra***, the appeal did not involve strangulation.

[7] "The provisions of 23 Pa.C.S. Ch. 61 (relating to protection from abuse) are necessary and proper in that they further the Commonwealth's compelling State interest to protect victims of domestic violence from abuse." Historical and Statutory Notes, Act 2005-66 legislation, at 1. The Protection From Abuse Act defines "abuse" as "[t]he occurrence of one or more [qualifying] acts between family or household members, sexual or intimate partners or persons who share biological parenthood[.]" 23 Pa.C.S.A. § 6102(a).

[8] Strack and Gwinn define "strangulation" as the "external compression of the neck [that] can impede oxygen transport by preventing blood flow to or from

The major findings are now common knowledge:

- most strangulation cases produce minor or no visible injury;

- many victims, however, suffer internal injuries and have documentable symptoms;

- most abusers do not strangle to kill – they strangle to show they **can** kill; [and]

- victims often suffer major long-term emotional and physical impacts[.]

**Id.** (Formatting and emphasis original) (some findings omitted).[9]

Of course, this study revealed strangulation to be a predictor of subsequent homicides in cases involving paramours – in fact, the study indicated that victims of prior attempted strangulation were seven times more likely to become homicide victims. **See id.** We are careful not to extrapolate this prediction to our case involving a parent and child. Our only focus is on the physical act itself, and whether it was "designed to cause," or "known to create," a substantial risk of causing death. We conclude that it was. Unquestionably, the degree and nature of force Moyer employed when he compressed B.M.'s neck was far beyond the justifiable use of parental discipline.

_____

the brain or direct airway compression." **Id.** This definition comports with what happened in this case, as well as Pennsylvania's legal definition of the offense. **See** 18 Pa.C.S.A. § 2718(a)(1) ("A person commits the offense of strangulation if the person knowingly or intentionally impedes the breathing or circulation of the blood of another person by: (1) applying pressure to the throat or neck.").

[9] These findings were also published in the **_Journal of Emergency Medicine_** as "Review of 300 Attempted Strangulation Cases" (2001). **See id.**

First, we disagree with Moyer that B.M.'s injury was minimal, as the testimony and properly admitted photographs illustrate otherwise. Moyer employed such force that the child's blood vessels ruptured, leaving marks. He left fingernail indentations in the child's neck. Linda Wenger, the physician's assistant who treated B.M in the emergency room, testified that the cuts on B.M.'s neck were "consistent with fingernail scratches" and the bruises on his neck were "consistent with pressure of fingers[;] [t]hey lined up correctly for finger placement." *See* N.T. at 66. B.M. testified that the bruising and pain lasted for weeks.

Moreover, even minor injuries, when they occur as a result of a strangulation, are indicative of a substantial risk of death. "Victims may have no visible injuries, yet because of underlying brain damage due to the lack of oxygen during the strangulation assault, they may have serious internal injuries or they may the days – even weeks – later." G. Strack & C. Gwinn, 26 FALL CRIM JUST at 34-45. Thankfully, there was no evidence of underlying brain damage in this case, but again, we focus on the risk created by the act, not the physical result.

Contrary to Moyer's argument, we are not bound by whether physical injury occurred. After all, the gravity of a strangulation, with or without injury, is made apparent by our Criminal Code's explicit proclamation: "Infliction of a physical injury to a victim shall not be an element of [strangulation; and t]he lack of physical injury to a victim shall not be a defense in a prosecution under this section." *See* 18 Pa.C.S.A. § 2718(b). In concluding that Moyer's conduct

was both designed to cause and known to create a "substantial risk of death," we need not address whether the facts of this case satisfied the other definitions of unjustifiable force, (*i.e.*, "mental distress," "extreme pain," etc.). We note, however, that B.M. testified that he consequently feared for his life, and that he suffered pain that lasted for weeks.[10]

In sum, we conclude the Commonwealth presented sufficient evidence to allow a jury to convict Moyer for strangulation, endangering the welfare of a child, and simple assault. Furthermore, we conclude Moyer's use of force was both designed to cause, and known to create, a substantial risk of death, pursuant to Section 509(1)(ii); consequently, Moyer was not entitled to the parental justification defense.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2020

---

[10]We also note a conclusion of Strack and Gwinn: "Strangulation is a form of power and control that can have a devastating psychological effect on victims in addition to the potentially fatal outcome, which includes the victim committing suicide." G. Strack & C. Gwinn, 26 FALL CRIM JUST at 35.